Seaman Anna **FLORES**, etc., et al.,
Plaintiffs,

v.

**SECRETARY OF DEFENSE** et al.,
etc., Defendants.

No. PCA 2276.

United States District Court,
N. D. Florida,
Pensacola Division.

Jan. 15, 1973.

Emily Carssow, Charles Morgan, Jr., Norman Siegel, Morris Brown, Neil Bradley, Atlanta, Ga., for plaintiffs.

William H. Stafford, U. S. Atty., Robert L. Crongeyer, Jr., Asst. U. S. Atty., Pensacola, Fla., for defendants.

## MEMORANDUM DECISION

ARNOW, Chief Judge.

This suit was instituted originally by plaintiff Flores seeking to prevent her discharge from the Navy on moral grounds for an unwed pregnancy. Her commanding officer had initially recommended:

"In spite of FLORES excellent professional performance and her strong desire to remain in the Navy, retention is not recommended. To do otherwise would imply that unwed pregnancy is condoned and would eventually result in a dilution of the moral standards set for women in the Navy."

Her contention, in substance, was that the Navy did not apply to men and women a single moral standard in determining retention in the service, so that her severance from service on that ground and the recommendation was unjustifiable discrimination violating the equal protection standard of the due process clause of the Fifth Amendment to the Constitution of the United States.

After the suit was instituted plaintiff Flores was, in fact, retained in the Navy, promoted, and subsequently released and discharged from enlistment at the expiration of her obligated service on January 31, 1972 after stating that she did not desire to re-enlist.

But those subsequent events did not moot or terminate this case. Her attorneys urged, and this court concluded, that this case could be converted into a class action challenging the alleged policy of the Navy in applying in retention and discharge cases one moral standard for women and another for men.

The matter has been diligently pursued by the parties with various legal theories advanced and argued and with exhaustive factual matter presented. It is now before the court for decision after final hearing.[1]

During the period in which this suit has been pending, the Navy has changed its regulation relating to service retention for pregnancy.[2]

By its order of January 19, 1972 this court held that the regulation of the Navy then in existence before the court was not unconstitutional on its face as against the challenge made of it by the plaintiffs.

While that regulation has, since that time, been changed, the reasoning set forth in the court's order of January 19, 1972 is also applicable to this current regulation, and it also, this court so holds, is not unconstitutional on its face.

In the court's prior order of January 19, 1972, the defendants' motion for summary judgment on the question of unequal morality standard for men and women was denied, and that issue remained for trial and resolution.

In addition, the court, in its pre-trial order, determined there would be considered, also, in final determination after trial, the question of unconstitutional interference with rights of privacy raised by the plaintiffs, as well as the moral standard issue.

Respecting the unequal morality matter, it is plaintiffs' contention that the Navy, regardless of the language contained in its present regulation or predecessor regulation, has, in fact, a policy that applies different moral standards to men and women in deciding retention in service; and that its action in so doing constitutes discrimination violating the Fifth Amendment.

In support of this contention, Plaintiffs have placed in evidence before the court a review of case histories covering the period from January, 1971 to Janu-

1. By its order of January 19, 1972, granting and denying in part defendants' motion for summary judgment and denying plaintiffs' motion for summary judgment, this court held adversely to plaintiffs on various contentions. There remain for decision only the matters dealt with in this memorandum decision.

2. A copy of its present regulation before this court is attached to this decision as an appendix.

ary, 1972 that do indeed indicate the moral implications of an unwed pregnancy were a factor in determining a woman's retention in service, but that no such moral implication was ever raised or considered in determining a man's retention in service. These records strongly suggest the Navy took into consideration an unwed pregnancy in determining retention of a woman in service but never took into consideration a man's actions in fathering children out of wedlock in determining a man's retention in service.

Presented also before the court was the testimony of the then-deputy Chief of Naval Personnel, Rear Admiral Plate. While in his deposition he stated a specific pregnancy would not, of itself, render a woman morally unfit to serve in the Navy and also stated that the Navy in determination of moral character and in connection with discharges applied only one standard from a moral point of view for both male and female, other statements that he made and other actions on his part suggest the contrary. In an affidavit, for example, he also stated that "if the circumstances surrounding the unwed pregnancy constituted evidence of prostitution or blatant promiscuity for example to the extent that these circumstances tended to establish a serious moral dereliction, that would be considered in conjunction with the other criteria to evaluate and decide the request for retention." Moreover, under him there were no guidelines for interpreting what would constitute blatant promiscuity or prostitution; his own testimony is less than conclusive in that respect. At another time in response to a question concerning what might cause him to overturn a recommendation for retention in service from a commanding officer, Admiral Plate made the reply that he would "look at" exactly the same thing the commanding officer has looked at, but pointed out that it would be from a much broader point of view. On those case histories, there were many instances in which commanding officers or those making

recommendations had recommended discharge on moral grounds; obviously, from the admiral's statement, he "looked at" those recommendations. On one occasion, in evaluating a request for retention, Admiral Plate stated he did not accept the rationale that men and women should be held to a single standard of morality.

At another time in an affidavit, he stated that to permit a serviceman to obtain a discharge for causing pregnancy illegally would provide a means whereby he could effectively abrogate the concept of compulsory military service, and, in his deposition, said that he meant by that a man could go out with the avowed purpose of finding a means to get out of the Navy and find some cooperative female whom he could get pregnant and use this means to get out of the Navy. These matters and other evidence before the court not delineated in this order do lead to the conclusion that, as late as January 4, 1972, the Navy did, indeed, in determining retention of pregnant women in service, use, as a factor in making such determination, a different moral standard than it applied to men.

But Admiral Plate is no longer the Deputy Chief of Naval Personnel. Succeeding him, as of July, 1972, is Admiral Baldwin. On the testimony of Admiral Baldwin, whatever prior Navy policy may have been, there is not now applied or considered a double moral standard for men and women in determining retention in service of pregnant women. His testimony is unequivocal that the issue in determining retention in service of pregnant women is the person's ability to do her job and cope with her physical condition, that moral character is not a factor, and that the same basic criteria are applied to both single and married pregnant women requesting retention in the Navy. Supporting his statement is the fact that a review of case histories of requests for retention covering the period from January 4, 1972 through August 31, 1972 reveals that the references and recommendations dealing in moral character so com-

mon in the reports of cases prior to January 4, 1972 were, in no single instance, even included.

It is undisputed that the person holding the position of Deputy Chief of Naval Personnel is the individual in the Navy responsible for the granting or denial of retention questions in pregnancy discharge cases.

■ It thus appears that, whatever prior policy the Navy may have had, plaintiffs have not, on the record before this court, carried the burden of establishing that the Navy, in considering requests for retention of pregnant women, now has a policy of holding men and women to different standards of morality, or that there is disclosed a policy by the Navy now in effect violating the Fifth Amendment.

■ Plaintiffs also contend the discharge of pregnant women because the Navy disapproves of the woman's participation in an extra-marital affair, the illegitimacy of her child or of other details of her private life violate the right to privacy guaranteed by the First, Fourth, Fifth and Ninth Amendments to the Constitution of the United States. In support, they cite cases pointing out these amendments protect against unwarranted governmental intrusion into matters of marriage, family and sex.

But under the Navy's present regulation and policy, it does not concern itself with any moral aspect of unwed pregnancy in determining discharge of pregnant women.

Its present regulation and policy may not be considered an unwarranted governmental intrusion into such matters and so an unconstitutional invasion of the right of privacy. Obviously, the Navy, concerned about the ability of its personnel to perform their duties, may and should reasonably concern itself with the pregnancy of its female personnel. And its regulation is not shown here on its face or through evidence submitted to be unreasonable, nor, under its present policy, an invasion of the right

of privacy that could be considered in any way an unconstitutional invasion.

■ Plaintiffs also contend that, on the record before this court, it should still proceed, notwithstanding the Navy's present regulation and policy, to give injunctive and declaratory relief.

On the record now before the court, there is no indication the Navy now has, or is likely to have in the future, a policy contrary to that presently existing. Conceding arguendo its prior policy presented improper and unlawful conduct, injunctive relief in this class suit at this time should be given only if there were here established a cognizable danger—something more than a mere possibility—that such prior policy would again be adopted by the defendants. United States v. Grant, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). No such danger is here established on the record. Nor should this court proceed, as requested by plaintiffs, to give declaratory relief spelling out, as applied to defendants, rights of equal protection and privacy for members of the armed forces where, as here, the record shows no policy now existing or likely to exist infringing on those rights, and no necessity for such declaratory relief.

Plaintiffs contend, in brief filed with the court, there may be infringement of individuals' rights in the future because defendants' present regulation does not positively proscribe comments on moral character from those evaluating retention requests.

This language is doubtless broader than plaintiffs intended—there may be occasions when inquiry into moral character might be proper and not violative of individuals' constitutionally protected rights. Beyond that, however, the absence of such positive proscription on the record here falls far short of disclosing any cognizable danger of future infringement, much less of future widespread infringement, of individuals' constitutional rights. Isolated cases of such infringement, should such occur,

should be handled in individual suits and not in a class action.

Final judgment will be entered for the defendants and against the plaintiffs, with this suit dismissed and without costs taxed against any party.

## APPENDIX

1070100 DEPENDENCY STATUS AND PREGNANCY STATUS FOR WOMEN

1. As used in this Manual the terms dependency status and pregnancy status are defined as:

a. Dependency status. Being a parent, natural or adoptive, of a child under 18, or having primary custodial responsibility of a child under 18, or being a stepparent of a child under 18 who resides in the woman's household more than 30 days a year.

b. Pregnancy status. Medical certification of pregnancy.

2. Women with dependency or pregnancy status as defined above shall not generally be allowed to enter or remain in the naval service. The Chief of Naval Personnel will consider on a case basis requests for exceptions to this policy under the provisions outlined below. A woman who is authorized by exception to serve with dependency or pregnancy status is expected to retain a high degree of commitment to concurrently fulfill her full professional responsibilities. No exemption from other personnel policies or preferential treatment by virtue of such status is to be anticipated. Commanding officers shall ensure that this paragraph is brought to the attention of any woman desiring to request exception to this policy in order that possible conflicts between her role in maintaining the Navy's posture of readiness and mobility and her motherhood role are fully understood.

3. Applications for enlistment, officer candidate enlistment, direct appointment and reappointment, or reenlistment more than 24 hours after separation shall not be accepted under any circumstances from women who are pregnant at the time of application. Prior pregnancy shall not of itself be a bar to application and where follow-on dependency status as defined above has not resulted, shall not require application review by the Chief of Naval Personnel, except as part of otherwise prescribed procedures. These same applications shall not be actively solicited from women with dependency status. However, when the needs of the naval service would best benefit by such action, applications from women in this category may be forwarded to the Chief of Naval Personnel for consideration. Applications shall include supporting evidence of the special skill, training, experience, etc., which will benefit the Navy and a brief explanation of dependency circumstances and dependent care arrangements relative to allowing for full attention to service responsibilities.

4. Women on active duty who acquire dependency or pregnancy status and who desire to remain in the Navy shall request retention consideration from the Chief of Naval Personnel. Consideration will be on a case basis.

a. A request for retention in service with dependency/pregnancy status shall be forwarded via the appropriate chain of command and shall include:

(1) Statement of dependency circumstances/Medical certification of pregnancy.

(2) Statement of motivation for retention in service

(3) Commanding officer's recommendation, to include:

(a) Substantive comment concerning level of performance

(b) Substantive comment concerning potential for continued beneficial service to the command and to the Navy

(c) Judgment concerning feasibility of dependent care arrangements relative to requirements of billet and watchstanding duties, etc. In pregnancy cases the

commanding officer's recommendation shall also include a statement as to whether loss of the member's service while in a leave status during the maternity period can be absorbed and the anticipated dates of commencement of leave and return to full duty. A minimum of six weeks' leave during the prenatal period and a maximum of six weeks' leave during the postnatal period shall normally be prescribed unless otherwise indicated by the attending physician.

(4) Recommendations from other appropriate sources, if desired (Chaplain, Division Officer, Chief Nurse, etc.)

b. Leave requested by active duty personnel for maternity purposes, if granted by the Chief of Naval Personnel, will be charged as earned leave, advance leave, or a combination thereof. Excess leave will be granted only in cases in which a combination of earned leave due and advance leave is insufficient to cover the total leave period. Sick leave may be utilized during the postnatal period if authorized by the hospital commanding officer on the advice of the attending physician. Should pregnancy be terminated prior to implementation of leave, the Chief of Naval Personnel shall be notified immediately via the commanding officer.

5. Women reservists on inactive duty who acquire dependency or pregnancy status and who desire retention in the Naval Reserve shall forward such requests to the Chief of Naval Personnel for consideration in the same manner as prescribed above, except that the following information shall be substituted for that relative only to active duty status:

a. The commanding officer's recommendation shall include his judgment of the feasibility of proposed dependent care arrangements relative to requirements of assigned mobilization billet in the event of call to active duty.

b. Request for retention shall include the anticipated number and dates of drill periods to be missed during the immediate prenatal and postnatal period.

6. Requests for separation by reason of dependency or pregnancy status shall be submitted in accordance with the guidance prescribed in the separation chapter of this Manual.