Joseph P. SEDULE, Plaintiff,

v.

The CAPITAL SCHOOL DISTRICT et al., Defendants.

Civ. A. No. 75–12.

United States District Court, D. Delaware.

Dec. 16, 1976.

Henry duPont Ridgely of Ridgely & Ridgely, Dover, Del., for plaintiff.

Nicholas H. Rodriguez of Schmittinger & Rodriguez, P. A., Dover, Del., for defendants.

## OPINION

LATCHUM, Chief Judge.

■ Joseph P. Sedule ("plaintiff") has brought this action under 42 U.S.C. § 1983 and the Fourteenth Amendment to challenge his dismissal on grounds of immorality and neglect of duty from the position of Assistant Superintendent for Administrative Services of the Capital School District (the "District") which serves Dover, Delaware and surrounding areas.[1] The District, the members of the Board of Education of the Capital School District (the "Board") at the time of plaintiff's dismissal, and Edward M. Powell ("Powell"), Superintendent of the District, have been named as defendants.[2] The plaintiff alleges denial of procedural and substantive due process and dep-

---

**1.** The Assistant Superintendent for Administrative Services, the second-ranking administrator in the District, is responsible for the "business" aspects of operating the schools including supervision of budget preparation, data processing, buildings and grounds, and cafeterias. (PX 21; Trial Transcript (Docket Items 31 & 31A, hereinafter "T.____"), 41, 93–94, 154, 298).

**2.** The Board members and Powell have been sued in both their individual and official capacities.

rivation of rights conferred by Delaware statute and by his employment contract with the District.[3] The case was tried before the Court, without a jury, on June 21 and 22, 1976.[4] Exposition of the facts awaits consideration of plaintiff's various contentions.

## I. Substantive Due Process

■ The plaintiff maintains that his dismissal was based on false charges or trivial reasons and, accordingly, that his right to substantive due process was violated. He argues that, because the Board reached the wrong result, he is entitled to a trial de novo on the charges in this Court. The plaintiff, however, misconceives the basic role of administrative fact-finders. This Court's review of the factual basis for the Board's decision is limited by the substantial evidence test and the plaintiff will not receive a trial de novo on the charges. *Klinge v. Lutheran Charities Ass'n of St. Louis,* 523 F.2d 56, 60–61 (C.A.8, 1975); *Blunt v. Marion County School Board,* 515 F.2d 951, 956 (C.A.5, 1975); *Simard v. Board of Education of Town of Groton,* 473 F.2d 988, 995 (C.A.2, 1973); *Shaw v. Board of Trustees of Frederick Com. Col.,* 396 F.Supp. 872, 889 (D.Md.1975); *see Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

■ To satisfy plaintiff's claim to a trial de novo in a federal court whenever, in the dismissed employee's view, the school board erred would mean that virtually every discharged public employee, with a property or liberty interest at stake, could relitigate fully his case in a federal forum. The school board hearing would be reduced to little more than a pre-trial academic exercise. Inevitably, the relationship between administrative bodies and the courts would be thrown askew if no deference were accorded to administrative findings. The role of this Court is to ensure that the Board's "finding is reasonable in light of the whole record" before it. K. C. Davis, Administrative Law of the Seventies § 14.11, p. 341 (1976).[5]

---

**3.** Subject matter jurisdiction over the claims against the Board members and the Superintendent is conferred by 28 U.S.C. § 1343(4) and the doctrine of pendent jurisdiction.

The jurisdictional vehicle of 28 U.S.C. § 1343(4) is not available for suit against the District because the District is not a "person" within the meaning of the act of Congress, 42 U.S.C. § 1983, upon which plaintiff relies. *City of Kenosha v. Bruno,* 412 U.S. 507, 513, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Although the Supreme Court has not ruled on the question, it appears to be the law of this circuit and district that a cause of action may be pleaded directly under the Fourteenth Amendment without regard to the implementing civil rights legislation. *Skehan v. Board of Trustees of Bloomsburg State Col.,* 501 F.2d 31, 44 (C.A.3, 1974), *vacated and remanded on other grounds,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975), *remanded,* 538 F.2d 53 (C.A.3, 1976); *Behan v. City of Dover,* 419 F.Supp. 562, 564 n.3 (D.Del.1976); *cf. Aldinger v. Howard,* 427 U.S. 1, 4, 96 S.Ct. 2413, 49 L.Ed.2d 276 n.3 (1976); *compare Hanna v. Drobnick,* 514 F.2d 393, 398 (C.A.6, 1975) *with Mitchell v. Libby,* 409 F.Supp. 1098 (D.Vt. 1976). Therefore, because the plaintiff has alleged damages, exclusive of interest and costs, in excess of $10,000, the Court has jurisdiction under the law of this circuit and district over the case against the District by virtue of 28 U.S.C. § 1331 and the doctrine of pendent jurisdiction.

**4.** The parties completed their post-trial briefing on October 21, 1976.

**5.** The plaintiff and defendants disagreed throughout the trial on the proper use of the transcript of the hearing before the Board. (DX 7) The plaintiff argues that the transcript is admissible only to show that a hearing was held and evidence was taken. Any additional consideration of the transcript, according to the plaintiff, would violate the hearsay rule and, also, would deny him his right to a fair and full trial in this Court.

First, Rule 801(c), F.R.Evid., defines "hearsay" as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the *truth* of the matter asserted." (emphasis added). Under a substantial evidence review of the Board's findings, the Court looks to the hearing transcript to ascertain the quality and quantity of evidence presented to the Board. However, the Court does not determine if the charges against the plaintiff were true or false. Thus, because the Court does not rely upon the transcripts for the truth of the matters asserted in testimony before the Board, the hearsay rule is not violated.

Second, as a necessary corollary to his argument that the veracity of the charges against

Although charges of immorality, misconduct in office, incompetency and neglect of duty were lodged against the plaintiff,[6] the Board found him guilty of only immorality and neglect of duty.[7] The Court, after a careful review of the copious transcript of and the exhibits adduced at the plaintiff's five-day hearing,[8] holds that the Board's finding of neglect of duty is buttressed upon substantial evidence. While the Board set forth its findings of fact in detail,[9] a cursory review of the evidence placed before the Board is essential to an understanding of plaintiff's claims.

The events leading to the demise of plaintiff's highly successful career as a school administrator [10] began sometime around January, 1971, when he struck up a intimate relationship with Joyce Naftzinger.[11] Both the plaintiff and Mrs. Naftzinger were married to other persons then and throughout the time relevant to the disposition of this case. From January, 1971, until June, 1972, when Mr. and Mrs. Naftzinger moved from Dover to Georgia, the plaintiff and Mrs. Naftzinger met three or four times each week during plaintiff's working hours.[12] His subordinates noticed his extended absences, without explanation, from his office and observed that he became less interested in and less attentive to his professional responsibilities.[13]

While plaintiff's duties required him to leave his office at times, it is clear that many of his unexplained absences were taken in furtherance of his amorous relationship with Mrs. Naftzinger. For example, a teacher in the District lent the use of his apartment to plaintiff for the evident purpose of meeting Mrs. Naftzinger.[14] Also, the plaintiff confided to a subordinate that he was conducting a sexual relationship during normal working hours.[15] When Mrs. Naftzinger was in Georgia, the plaintiff would frequently place lengthy telephone calls to her during normal working hours.[16] In December, 1972, Mr. and Mrs. Naftzinger moved to Reading, Pennsylvania, but in June, 1973, the plaintiff rented an apartment in Dover for Mrs. Naftzinger and

the plaintiff must be established independently in this Court, the plaintiff contends that "[a] hearing before the school board cannot be substituted as a trial of the issues before the District Court." *Ward v. Kelly*, 476 F.2d 963, 964 (C.A.5, 1973); *Thompson v. Madison County Board of Education*, 476 F.2d 676, 678 (C.A.5, 1973). Not only do the unique factual circumstances of those cases render their precedential value questionable, but also the plaintiff's interpretation of the language is inconsistent with subsequent Fifth Circuit decisions which applied a substantial evidence test to the review of school board hearings. *See, e. g., Blunt v. Marion County School Board, supra.*

Therefore, notwithstanding plaintiff's impassioned pleas to the contrary, the Court will look to the transcript of the hearing before the Board in order to determine if the charges were supported by substantial evidence.

6. PX 6. *See* 14 Del.C. § 1420.

7. PX 4; PX 5.

8. DX 7.

9. PX 5.

10. The plaintiff joined the District's predecessor, the Dover Special School District, as principal of Dover High School in 1959. (Docket Item 13, par. 1(a), pars. 2(a) & (b); Docket Item 14, pars. 1 & 2; Docket Item 28, pars. 3(a) & (c)). Plaintiff was promoted to Administrative Assistant in 1964 and by 1968 had become Assistant Superintendent for Administrative Services. (Docket Item 13, pars. 2(g) & (k); Docket Item 14, par. 2). Written evaluations by his superiors over the years indicate that plaintiff was a competent and effective school administrator. (*E. g.,* PX 11; PX 12; PX 13; see T. 131, 153). As Robert T. Rasmussen, Powell's predecessor as Superintendent, observed in his October, 1971, evaluation of the plaintiff, "His depth of knowledge in school finance, and his considerable skill and careful decision-making, make him close to being indispensable." (PX 14; DX 7, Adm.Exh. 7).

11. DX 7, p. A–35.

12. DX 7, pp. A–36–37, –40.

13. *E. g.,* DX 7, pp. B–10, –11, –26–28, –78–79, –104–05. Mrs. Naftzinger estimated that at times the plaintiff devoted only four hours each day to school duties. (DX 7, p. A–88).

14. DX 7, p. C–7–8.

15. DX 7, p. B–10.

16. DX 7, pp. A–40–41.

persuaded her to leave her husband in order to be near the plaintiff.[17] Shortly before the dismissal proceedings began, Mrs. Naftzinger returned to Reading and her husband.[18]

In addition to interfering with the performance of his duties in Dover, the plaintiff's relationship with Mrs. Naftzinger also adversely affected his attendance at professional meetings. The plaintiff was designated to attend a three-day convention in Philadelphia, Pennsylvania in March, 1971. Mrs. Naftzinger accompanied the plaintiff to Philadelphia with the consequence that plaintiff spent little more than one hour at the convention.[19] On another occasion, the plaintiff was sent to a convention in Atlantic City, New Jersey in February, 1973. One morning, he departed Atlantic City for Reading at 4:30 A.M. to visit Mrs. Naftzinger and did not return until approximately 3:00 P.M. that afternoon. Thus, on account of his desire to be with Mrs. Naftzinger, he missed most of one day of the convention.[20]

In sum, the record before the Board clearly supported its conclusion that the plaintiff had neglected his duties to the District as a result of his relationship with Mrs. Naftzinger, and, accordingly, the Board had "good and just cause" for dismissing him.

Furthermore, there is sufficient evidence in the record before the Board to sustain its decision to dismiss the plaintiff for immoral conduct.

For example, in December, 1971, the plaintiff took nude and partially nude photographs of Mrs. Naftzinger.[21] He threatened to send the photographs to executives of the company for which Mr. Naftzinger worked as a means of inducing him to permit his wife to remain in Dover when he was transferred to Georgia.[22] After informing a subordinate who had once worked for the same company of the pictures he had taken, the plaintiff asked for names of executives of the company so that he would be able to send them photographs.[23] Twice the plaintiff sent photographs to Mr. Naftzinger. First, in an effort to have Mrs. Naftzinger leave Georgia, he sent a partially clothed picture of Mrs. Naftzinger to her husband.[24] Second, when Mrs. Naftzinger returned to Reading in November, 1973, the plaintiff mailed to Mr. Naftzinger a picture of Mrs. Naftzinger in the nude; it carried the inscription: "Please don't make trouble, just go." [25] In sum, it is likely that this conduct alone would have supplied an adequate reason for dismissal.[26]

However, while making factual findings about the plaintiff's involvement with the pictures, the Board curiously chose to base its actual decision to dismiss for immoral conduct solely on his adulterous relation-

17. DX 7, pp. A–41, –45, –176–77.

18. DX 7, p. A–177.

19. DX 7, pp. A–47–48.

20. DX 7, pp. A–55–56; B–30–31. Evidence indicating that the plaintiff left a convention in Las Vegas, Nevada one day early to visit Mrs. Naftzinger was also presented. (DX 7, pp. A–57, E–118).

21. DX 7, p. A–49.

22. DX 7, p. A–168.

23. DX 7, pp. B–18–20. The plaintiff used District facilities to make copies of a photograph of a partially nude woman, (DX 7, pp. B–142–43), and he also showed nude pictures of Mrs. Naftzinger to school employees. (DX 7, p. C–24).

24. DX 7, p. A–168.

25. DX 7, pp. A–167–74, E–141.

26. At trial, the defendants sought to introduce five letters, each containing the picture of a naked woman, purportedly Mrs. Naftzinger, which the plaintiff allegedly sent to neighbors of the Naftzingers in Reading in January, 1974, after the hearing before the Board. (T. 230–41). The plaintiff objected to admission of the letters and photographs; the exhibit was marked (DX 1) and decision on admissibility was reserved until after post-trial briefing. The Court concludes that the letters and photographs are not relevant to any issues which it must decide at this time and, therefore, has excluded this exhibit from its deliberations.

ship.[27] Because an adequate alternative ground for dismissal was offered, the Court deems it unnecessary to probe into the issue of whether a continuing course of adultery could constitute a basis for dismissal from public employment. *Cf. Major v. Hampton*, 413 F.Supp. 66 (E.D.La.1976) (conduct tending to discredit his employer).

The plaintiff also contends that the Board's decision to terminate his employment: (1) was arbitrary and capricious because the charges lacked a rational nexus to his performance as a school administrator; (2) should be overruled because he was not given adequate warning that his conduct could lead to his dismissal; and (3) invaded his constitutionally sanctioned right to privacy. The Court concludes that these contentions, with respect to charges of plaintiff's neglect of duty, are meritless and warrant only brief discussion.

First, it is clear that plaintiff's absence from work and failure to attend professional meetings had a direct impact upon the performance of his professional duties. Indeed, neglect of duty, by its very nature, is job-related. Second, the Court cannot conclude that plaintiff was reasonably unaware that his conduct could lead to his discharge. Because the rule is obvious and fundamental, an employer need not declare expressly that failure to attend to one's job duties can result in termination.[28] See 14 Del.C. § 1420. Third, although the boundaries of the right to privacy are difficult to fix, the right to privacy has little application in this case where the dismissal is based on neglect of duty. Job performance by a public employee presents a public concern; failure to fulfill public employment duties cannot be protected by asserting generally that conduct which interferes with job performance is private. Thus, even if the Court accepts plaintiff's contention that his affair with Mrs. Naftzinger was private,[29] its public impact in terms of job performance took it from behind any protective shield that the right to privacy may have constructed around the underlying conduct.

Thus, the Court holds that plaintiff's dismissal did not deny him substantive due process.

## II.  *Procedural Due Process*

Plaintiff alleges that the Board members decided to terminate his employment before he was afforded a fair hearing by an impartial and unbiased tribunal that procedural due process requires.[30] Obviously, a "fair trial in a fair tribunal is a basic

---

**27.**  PX 5, pp. 23–24.

**28.**  The record before the Board indicates that written guidelines for office hours had been established in 1970. (DX 7, Board's Exh. 12; but see Docket Item 12, No. 26).

A departure by the Board from its guidelines for employee conduct is also alleged by the plaintiff. Although it is far from clear that it is applicable to the plaintiff, he points to the contract between the District and the Capital Education Association (PX 1) which provides in part:

"The personal life of a teacher is not an appropriate concern for action by the Board except as it may *directly* prevent the teacher from performing properly his assigned functions during the work day." (emphasis added). (PX 1, p. 30).

Accordingly, the Board policy of not interfering in the personal life of its employees is expressly limited by the clause which excepts, from the general directive, conduct which directly affects job performance. Because the Board reasonably determined that the plaintiff's conduct directly affected the performance of his duties, it did not violate any previously established laissez faire policy.

**29.**  Plaintiff persists in maintaining that his relationship with Mrs. Naftzinger was no more than a discrete love affair which neither meant nor caused any untoward harm to anyone. This contention, however, falls before the overwhelming evidence offered to and accepted by the Board.

**30.**  *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Both property and liberty interests of the plaintiff were involved in the efforts to discharge him. His property interest was established by his contract of employment (PX 22); it is also clear that his dismissal on grounds of immoral conduct implicated a liberty interest. *Board of Regents v. Roth, supra*, at 573, 92 S.Ct. 2701.

requirement of due process." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). The defendants do not deny that the plaintiff was entitled to a fair hearing before an impartial and unbiased tribunal prior to termination of his contract with the District. The defendants, however, do dispute plaintiff's contention that the Board members were biased and had prejudged the issues.[31] In order to resolve the conflict, it is necessary to develop the relevant factual background in some detail.

During the summer of 1971,[32] Mr. Naftzinger first complained orally to the Board about the affair which the plaintiff was carrying on with Mrs. Naftzinger.[33] However, because the Naftzingers were unwilling to testify about their difficulties with the plaintiff,[34] the Board took no action on their complaint beyond delegating two members, defendant Hill and Dale Dougherty,[35] to ask the plaintiff to discontinue his alleged association with Mrs. Naftzinger before it embarrassed and discredited the District.[36] This warning apparently did not persuade the plaintiff to end the relationship since by late October or early November, 1973, the Naftzingers were again petitioning the Board for assistance.[37] Defendants Camper and Powell advised them if they wished to file charges to do so in writing;[38] thereafter, on November 5, 1973, Mrs. Naftzinger personally delivered to Powell a two-page affidavit setting forth their allegations against the plaintiff.[39]

After some investigation by Powell[40] of the charges, an executive session of the Board was convened in the afternoon of November 12, 1973, to discuss the action to be taken in response to the allegations in Mrs. Naftzinger's affidavit.[41] The Board members learned of the charges and decided that it was necessary to determine if the Naftzingers were willing to testify concerning the charges.[42]

Thus, the Board members, Powell, N. Maxson Terry, Jr. ("Terry"), the Board's attorney, the Naftzingers, and their attorney met in the evening of November 12, 1973.[43] The Naftzingers assured the Board that the charges outlined in the affidavit were true and that, if requested, they would testify before the Board about the plaintiff's conduct.[44]

The Board members did not ask the Naftzingers for additional information on the plaintiff's activities.[45] Also, Mr. Naftzinger excoriated the Board for having failed to dismiss the plaintiff earlier.[46]

The Naftzingers and their attorney left the meeting after less than thirty minutes,[47] and Powell then reported briefly on the results of his investigation. Powell, however, did not describe the findings of his investigation in any detail.[48] Terry then

---

31. Plaintiff appealed the adverse decision of the Board to the Delaware State Board of Education which affirmed his dismissal. The State Board had no prior connection with the case. (DX 8; T. 266–67; Docket Item 8, No. 5; Docket Item 12, No. 1). The plaintiff does not challenge the fairness of the appeal process.

32. T. 7.

33. T. 49–50.

34. T. 26–27.

35. T. 26.

36. T. 34, 50.

37. T. 376–78.

38. T. 69, 378.

39. T. 378–79; PX 2.

40. T. 226.

41. T. 70.

42. T. 70.

43. T. 71–72, 385; Docket Item 12, No. 12. The plaintiff was not notified of this meeting. (T. 15, 53–54; Docket Item 12, No. 15.)

44. T. 13–14, 71; Docket Item 12, No. 12.

45. T. 71.

46. T. 14, 71–72, 81–82.

47. T. 283.

48. T. 259, 384–87.

expressed his opinion that, if Powell's factual conclusions could be proved, proper grounds for termination of the plaintiff would be presented.[49]  Termination procedures were discussed generally, and it was recommended that a hearing be held to determine the accuracy of the charges against the plaintiff,[50] and that an independent attorney be retained to advise the Board while Terry was pursuing the case against the plaintiff.[51]  Near the end of the meeting, the Board unanimously adopted the following resolution:

> "Following presentation of a written, notarized complaint by Mr. and Mrs. Robert Naftzinger listing various *alleged charges* against Mr. Joseph P. Sedule, Mrs. Dorothea Samardza moved that *proceedings be instituted* by the Capital School District Board of Education's law firm of Terry and Terry to *terminate the services of Mr. Sedule* as of December 18, 1973, as outlined by Delaware State Code. . ."[52] (emphasis added).

From this November 12, 1973 meeting until the hearing began in December, Terry and Powell strove to isolate the Board members from news of their investigation,[53] and, indeed, when the hearings began the Board members did not know what evidence would be presented or who the witnesses, in addition to the Naftzingers, would be.[54]

Thereafter, Terry prepared a detailed list of charges against the plaintiff and presented it to defendant Camper for signature.  Defendant Camper signed the document because, as president of the Board, his signature was thought necessary to initiate the proceedings and not because he was vouching for the accuracy of the charges.[55]

Neither defendant Camper nor any other Board member took any role in drafting[56] the letter which gave notice to the plaintiff of the charges against him and provided in part:

> "This is to advise you that the Board of Education of the Capitol [sic] School District *intends to terminate* your services as Assistant Superintendent as established by a contract between yourself and the Capitol [sic] School District attached hereto.  The termination of your services is effective as of December 18, 1973.

> "Although you are not entitled to Tenure under Title 14 Chapter 14 Delaware Code, the Board of Education has determined to follow the procedures set out therein so as to assure you a fair hearing and due process. . . . [Y]ou may demand a hearing before the Board . . within ten days after receipt of this written notice of termination.

> "The reasons for your termination are immorality, misconduct in office, incompetency and neglect of duty.

> "The following facts provided us by Joyce Naftzinger and Robert Naftzinger and corroborated in part by inquiries made at our request, are the basis for the foregoing reasons for your termination.  We further advise you that we realize that we have not heard your side of the story as fully as you might desire and that should you request a hearing, we will afford you one promptly and evaluate all of the evidence which might be submitted fully and fairly."  (emphasis added).

[The specific charges against the plaintiff spanned three pages.][57]

---

49.  T. 226, 259.

50.  T. 259, 386.  The ambiguous Delaware law on the termination rights of school administrators, see note 75, *infra,* generated some confusion, but the Board eventually determined, with the subsequent concurrence of the plaintiff, to adopt, where reasonably applicable, the procedures set forth in the Teacher Tenure Act, 14 Del. C. § 1401, et seq.

51.  T. 260–61.

52.  PX 3.

53.  T. 260, 382.

54.  T. 28, 30, 265.

55.  T. 88, 260.

56.  T. 75.

57.  PX 6.

Terry explained that the detailed charges were given in a matter of fact manner because he modeled the notice letter after a complaint or indictment.[58] It is clear, however, that the Board members treated the contents of the notice letter as mere accusations and not as proven "facts." [59]

The notice letter was delivered to the plaintiff by defendants Camper and Hill on November 15, 1973.[60] Plaintiff, through counsel, timely demanded a hearing [61] and it consumed five days beginning December 14, 1973, and ending January 9, 1974.[62]

At the opening of plaintiff's hearing, defendant Camper, on behalf of the Board, said:

"I further want to state on behalf of myself and on behalf of the members of the Board of Education, that although we have noted our intention to terminate the services of Mr. Sedule, we go into this hearing with an open mind and we will only consider evidence at this hearing in making our determination of whether or not to terminate Mr. Sedule's contract. We have not heard Mr. Sedule's side of the case, and we go into this hearing with the intention of affording Mr. Sedule a fair, unbiased and impartial hearing." [63]

In addition, Board members testified at trial that they concurred in defendant Camper's statement and that they approached the plaintiff's hearing with open minds un-

tainted by any element of prejudgment or bias against the plaintiff.[64]

In order to establish that the involvement of the Board in the investigation of allegations about the plaintiff's conduct foreclosed the opportunity for a fair hearing, the plaintiff "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). This is a particularly difficult task to perform in the context of this case because "[t]he mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing." *Id.* at 55, 95 S.Ct. at 1468; *Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 491–493, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976). Accordingly, plaintiff is confronted with the burden of proving that the hearing held in December, 1973, and January, 1974, leading to his ultimate dismissal "contained an unacceptable risk of bias against [him]." *Martin-Trigona v. Underwood,* 529 F.2d 33, 37 (C.A. 7, 1975); *Burnley v. Thompson,* 524 F.2d 1233, 1241–42 (C.A. 5, 1975).

The Court finds that no member of the Board prejudged the case against the plaintiff. The exposure of the Board to the factual underpinnings of the ultimate charges,[65] when measured against the *With-*

---

58. T. 262.

59. T. 78.

60. T. 60–61.

61. DX 5. Delaware's cumbersome teacher dismissal procedure requires a school board to give the employee notice of its intent to terminate him. If the employee fails to request a hearing, the result of the notice of intent to terminate is final termination. A timely request by the employee preserves the full panoply of due process rights. 14 Del. C. §§ 1412, 1413, 1420.

62. Docket Item 12, No. 1; DX 7. The succeeding dates were scheduled to minimize the inconvenience to the Board, plaintiff and attorneys. (*E. g.,* DX 7, p. B–156).

63. DX 7, pp. A–6–7.

64. T. 43–44, 58, 76, 200.

65. The plaintiff brought the issue of disqualification through advance exposure to the evidence to the attention of the Board, but the members declined the opportunity to recuse themselves. (DX 7, pp. A–13–14). Plaintiff also objected to the presence of defendant Hill on the hearing panel because of an alleged altercation between defendant Hill and the plaintiff on school grounds shortly after the plaintiff joined the District and, also, because the plaintiff allegedly had opposed defendant Hill's election to the Board. (DX 7, pp. A–26, –32). It is not clear if the plaintiff has pursued this latter objection in this Court (Docket Item 32, p. 53; Docket Item 8, No. 4(a)), but it is sufficient to point out that the evidence falls far short of suggesting any reason to expect bias on the part of defendant Hill. (T. 31–34).

*row* standard, was minimal and did not create a constitutionally significant risk of bias. In *Withrow,* the Examining Board held two evidentiary hearings. The first hearing, at which "numerous witnesses testified," 421 U.S. at 40, 95 S.Ct. 1456, and which the party to-be-charged could attend, was conducted "to determine whether he had engaged in certain proscribed acts." *Id.* at 39, 95 S.Ct. at 1460. A subsequent hearing was scheduled to "determine if violations had been committed which would warrant suspension of [his] license." *Id.* at 54, 95 S.Ct. at 1468. The Board in this case, in contrast, did not hear testimony, in the normal sense of the term, at either of the November 12, 1973, meetings. Understandably, the Board did not want to embarrass either the plaintiff or the District by filing charges against the plaintiff without first assuring themselves that the Naftzingers were willing to give testimony under oath regarding the serious charges made. Under both Delaware law and plaintiff's contract of employment, it is the Board's responsibility to determine whether charges against an employee should be presented.[66] To fulfill this requirement, the Board needed to know the thrust of the charges against the plaintiff. The Powell summary and the Naftzinger affidavit were certainly the most reasonable, limited sources of essential background information, and the Board's preliminary consideration of that information was analogous to a probable cause hearing on a criminal complaint.

The plaintiff's primary argument can be stated as follows: because the Board members were exposed to some critical statements about the plaintiff and because they instructed the Board's attorney to initiate termination proceedings, it necessarily follows that the Board members unalterably decided to discharge the plaintiff in November, 1973, and used the December-January hearing merely to build a record to justify

their previous decision. Having heard the testimony of the witnesses and weighed their credibility at trial, the Court finds that the evidence adduced simply does not support the inference which the plaintiff asks the Court to draw. The Court accepts the testimony of the Board members that they recognized their duty to be fair and to approach the hearing without any preconceived, personal notions of the outcome. The careful questioning by Board members of witnesses at the hearing indicates a genuine concern for accurately disposing of the charges against the plaintiff;[67] such concern is inconsistent with the contention that the hearing was a charade. Furthermore, the Board had not gone beyond the point where a finding in favor of the plaintiff would have given "the appearance of having erred or changed position," *Withrow v. Larkin, supra* 421 U.S. at 57, 95 S.Ct. at 1469, since they viewed the events set forth in the notice letter as no more than charges to be resolved in a later adversary hearing if the plaintiff chose to request a hearing. In short, the Court concludes that the Board did give the plaintiff a fair hearing free from any bias or prejudgment. *Cf. Swab v. Cedar Rapids Community School District,* 494 F.2d 353 (C.A. 8, 1974); *Barszcz v. Board of Tr. of Com. Col. Dist. No. 504,* 400 F.Supp. 675 (N.D.Ill.1975).

The plaintiff has marshaled several statements of either Board members or the Board's attorney in support of his contention that the Board had decided to terminate his contract in November, 1973, before he received a fair hearing. For example, at the hearing before the Board, Terry opened his presentation by stating:

"This hearing is being held as a result of the decision to terminate Mr. Sedule's employment with the Capital District. . . ."[68]

In his post-hearing brief to the Board, Terry wrote:

---

66. *Phillips v. Board of Education of Smyrna Sch. Dist.,* 330 A.2d 151, (Del.Super.1974), *aff'd,* No. 275, 1974 (Del.Supr.1975); PX 22.

67. *E. g.,* DX 7, pp. A–153–57; B–68–75; E–157–82.

68. DX 7, p. A–11.

"This is a hearing to consider whether the termination of the employment of Joseph Sedule should be . . . upheld." [69]

The minutes of the March 4, 1974 meeting, at which the Board formally dismissed the plaintiff after hearing and directed its independent counsel to prepare a written opinion, provide in part:

"[I]t is the decision of the Board that Mr. Sedule's termination be reaffirmed. . . ." [70]

Finally, defendant Samardza testified at trial:

"BY [PLAINTIFF'S ATTORNEY]:

Q. So on November 12, 1973 the Board decided to terminate Mr. Sedule as of December 18?

A. Yes, sir." [71]

Thus, at several places in the record the Board or its attorneys employed language which taken out of context of the whole record could be construed as inconsistent with the denials of prejudgment.

"Clearly, if the initial view of the facts based on the evidence derived from non-adversarial processes as a practical or legal matter foreclosed fair and effective consideration at a subsequent adversary hearing leading to ultimate decision, a

substantial due process question would be raised." *Withrow v. Larkin, supra,* 421 U.S. at 58, 95 S.Ct. at 1470.

In spite of the above quoted statements made on behalf of the Board, the Court remains convinced that the Board members had not decided the case against the plaintiff before his hearing. The language sampled by the Court can be placed into two broad categories. First, although the statements of the Board's attorney can be characterized as imprecise,[72] there is no indication that his language affected the substance and fairness of plaintiff's hearing. Second, in reviewing statements of Board members, it must be remembered that because language can be used imprecisely it is often necessary for courts, especially in a constitutional context, to look behind the words used to the actions of those who spoke the words. This is such a case; the plaintiff did receive a fair hearing; the Board had not reached the decision before the hearing.[73]

Thus, the Court holds that plaintiff's dismissal did not deprive him of any rights protected by procedural due process.

### III. *Miscellaneous Issues*

The plaintiff asserts that the defendants breached his employment contract [74] by dis-

---

**69.** PX 20, p. 1.

**70.** PX 4.

**71.** T. 18. See also PX 6; T. 83–84; PX 5, pp. 1, 24.

**72.** Terry conceded that he had erred when he stated that the December-January hearing was held to affirm a previous determination. T. 253–54.

**73.** Plaintiff has relied extensively on *King v. Caesar Rodney School District,* 380 F.Supp. 1112 (D.Del.1974). In *King,* a teacher's dismissal was held violative of procedural due process because the school board had prejudged the merits of the case. This Court, as a matter of fact, found:

"[T]he Board of Education not only examined virtually all of the relevant evidence concerning plaintiff's teaching performance, but it also weighed that evidence and reached the conclusion that there was 'just cause' for dismissal. Additionally, the Board members testified that unless new evidence were

presented at a subsequent termination hearing, they would vote the same way. Thus, the Board had concluded its investigative and deliberative task before the termination hearing required by Delaware law and the due process clause, and plaintiff was confronted with a fait accompli."

*Id.* at 1119.

The Board in this case, however, did not receive a detailed presentation of evidence in a nonadversarial setting and did not approach plaintiff's hearing with the attitude exhibited by the school board in *King.* Furthermore, it should be noted that the mixing of investigative and deliberative functions that troubled the Court in *King* was accepted by the Supreme Court in *Withrow v. Larkin, supra.*

**74.** PX 22. The contract provides in pertinent part:

"That termination of this contract before its expiration date may occur . . . by action of the Board for good and just causes provided the Board does not arbitrarily call for his dismissal; but will serve the adminis-

missing him arbitrarily, without good and just cause, and without according him a fair hearing before the Board. Because the Court has already decided that the plaintiff's dismissal was based on a rational reason and supported by substantial evidence, was not arbitrary, and occurred after a fair hearing, the plaintiff's contract claim must also be rejected.

■ The plaintiff next argues that his dismissal was carried out in violation of 14 Del.C. § 1401 et seq., because there was no rational nexus between his conduct and his job performance and because he was denied a fair hearing. Even if 14 Del.C. § 1401 et seq., which is basically Delaware's teacher tenure law, is applicable to the plaintiff,[75] he was not deprived of any of his procedural rights; in spite of plaintiff's contention to the contrary, the Court has already held that he received a fair hearing and that the evidence adduced before the Board amply supported its decision to discharge him.

■ The plaintiff also contends that the Board's private meetings of November 12, 1973, violated 29 Del.C. § 5109, which provides:

"The meetings of all boards and commissions of the State or any political subdivision thereof at which any business is transacted shall be open to the public and to representatives of the press. Nothing contained in this section shall be construed to prohibit executive sessions or conferences of such boards and commissions at which no business shall be transacted."

Consistent with his position on when the termination occurred, the plaintiff maintains that his "termination" was the "business" conducted at the evening meeting of November 12. The Court, however, has found that the Board merely initiated termination proceedings at that meeting. Thus, still to be answered is the question of whether the decision to initiate termination proceedings is, under the circumstances of this case, within the scope of § 5109.

On its face, the statute suggests a greater concern for the public's right to know of the actions of public officials than for the protection of the individual whose interests are affected by the "business" transacted at the closed meeting. Yet it cannot be stated confidently that insuring a fair decision by force of public scrutiny was not a concomitant legislative purpose.

However, it is clear that school boards meet frequently in executive session to resolve personnel matters.[76] A particularized statute, 14 Del.C. § 1413(1), allows for private termination hearings at the election of the employee whose dismissal is sought. In fact, the plaintiff chose to have a private hearing.[77] The employee's privilege of avoiding the embarrassment of a public hearing would effectively be destroyed if school boards were required to make their decisions to initiate termination proceedings at public meetings. Furthermore, if the school board decided not to have charges filed against the employee, a public meeting would cause needless embarrassment to the employee. Thus, the Court will not read § 5109 as impinging upon the employee's choice of a public or private forum for resolution of charges against him as provided by 14 Del.C. § 1413(1). It follows that plaintiff was not denied any rights conferred by § 5109.

In conclusion, the plaintiff has failed to persuade the Court by a preponderance of the evidence that his discharge was defective in any material way, and judgment will be entered in accordance with this opinion which shall constitute this Court's findings

---

trator with a written performance evaluation and a fair hearing before the Board."

**75.** The Court does not decide whether the termination provisions of 14 Del.C. § 1401 et seq. apply to plaintiff, a school administrator. Although 14 Del.C. § 1094(b) provides that "[a] school employee *may* be dismissed . . . in accordance with [14 Del.C. § 1401 et seq.]," (emphasis added), 14 Del.C. § 1401(2) expressly exempts assistant superintendents from the definition of "teacher" and only "teachers" are granted any rights by 14 Del.C. § 1401 et seq.

**76.** T. 55.

**77.** DX 5.

of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

## JUDGMENT

For the reasons set forth in the Court's opinion entered in this case, on this date, it is

ORDERED

Judgment is entered in favor of defendants and against plaintiff.