John R. JOHNSON, Plaintiff,

v.

SAN JACINTO JUNIOR COLLEGE
et al., Defendants.

Civ. A. No. H–78–1056.

United States District Court,
S. D. Texas,
Houston Division.

Sept. 10, 1980.

---

Larry Watts, Law Offices of Larry Watts, P. C., Houston, Tex., for plaintiff.

Stanley D. Baskin, Baskin, Fakes & Stanton, Pasadena, Tex., for defendant San Jacinto Jr. College and for defendants Spencer, Anders, Davison, Ogden and Smallwood in their official capacities.

Chris Butler, Reynolds, Allen & Cook, Houston, Tex., for defendants Spencer, Anders, Davison, Ogden and Smallwood in their individual capacities.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

### I. Introduction

Plaintiff brought this action pursuant to 42 U.S.C. § 1983 (1978), alleging that defendants by their various actions associated with changing his job classification from Registrar to teacher at defendant College, violated his constitutional right of privacy and his First Amendment rights, and denied him his Fourteenth Amendment guarantees of procedural and substantive due process. Plaintiff seeks equitable and legal relief in the forms of injunction and declaratory judgment, compensatory and exemplary damages, back pay, reinstatement and attorney's fees. On February 5, 1980, the cause was tried to the Court without a jury. Pursuant to Rule 52, Fed.R.Civ.P., the Court enters the following Findings of Fact and Conclusions of Law reflecting the Court's determination that all defendants violated plaintiff's rights to substantive and

procedural due process, and his rights pursuant to the First Amendment, and that defendant Spencer violated plaintiff's right to substantive due process. The Court, however, does not find that defendants violated plaintiff's constitutional right of privacy.

## II. Findings of Fact

1. John R. Johnson is a resident of Harris County, Texas. Stipulation.

2. San Jacinto Junior College is a public junior college in Harris County, Texas, owned and operated by the San Jacinto Junior College District, which includes the geographical area composed of the following independent school districts: Channelview; Deer Park; Galena Park; LaPorte; Pasadena; and Sheldon. The principal place of business of San Jacinto Junior College is 8060 Spencer Highway, Pasadena, Harris County, Texas 77505. Stipulation.

3. Dr. Thomas Spencer is President of San Jacinto Junior College. Stipulation.

4. F. G. "Frenchie" Anders resides in Pasadena, Harris County, Texas. In 1977 he was President of the Board of Regents of San Jacinto Junior College. Stipulation.

5. Dr. W. R. Davison is a resident of LaPorte, Harris County, Texas. He is a member of the Board of Regents of San Jacinto Junior College. Stipulation.

6. Charles Ray Ogden is a resident of Channelview, Harris County, Texas. He is a member of the Board of Regents of San Jacinto Junior College. Stipulation.

7. W. L. "Levi" Smallwood is a resident of Harris County, Texas. He is a member of the Board of Regents of San Jacinto Junior College. Stipulation.

8. From August 6, 1962 through May, 1974, plaintiff was employed as a history teacher by San Jacinto Junior College. Stipulation.

9. On or about March 4, 1974, plaintiff was employed under a one year contract as Registrar of the North Campus of San Jacinto Junior College commencing September, 1974, subject to the policies of employment as set forth in the Faculty Handbook of August, 1974. Stipulation.

10. Plaintiff was employed as Registrar for the North Campus of San Jacinto Junior College for the 1974–75, 1975–76, and 1976–77 school years. Each of his contracts was subject to the policies of employment as specified in the applicable Faculty Handbook. Stipulation; Testimony of John R. Johnson; Testimony of Thomas Spencer.

11. On or about April 4, 1977, the Board of Trustees of San Jacinto Junior College passed Motion No. 3464, re–electing plaintiff as Registrar of the North Campus for the 1977–78 academic year. Plaintiff advised defendant Spencer of his acceptance of the position by letter dated April 7, 1977. Stipulation; Plaintiff's exhibit 4/Defendants' exhibit 10; Plaintiff's exhibit r/Defendants' exhibit 9.

12. Defendant College had in effect in 1977–78 two policies concerning assignment of faculty and renewal of contracts. The "Policy of Employment" read as follows:

> "All teaching personnel and administrators of the San Jacinto District are employed upon probation for the first three years of employment and at such other times as may be determined by the Board of Regents. No employment shall result in tenure.
>
> All promotions of employees to administrative positions shall not be considered permanent and the teacher or employee may be reassigned to a position as instructor, or former employment upon direction of the Board of Regents."

Defendants' exhibit 5 at 13/Plaintiff's exhibit 6 at 3.

The policy concerning "Election of Faculty" provided, in pertinent part, as follows:

> "Faculty members are elected in April of each year on the recommendation of the President for the succeeding long term. . . . Re–election for one or more terms should not be construed as leading to tenure."

Defendants' exhibit 5 at 13/Plaintiff's exhibit 6 at 2. Despite the language of the policies regarding tenure, the Court finds that when an employee satisfactorily has

completed probation, that person is considered by the College to have job security. Further, the Court finds that the usual procedure at the College is to renew the contract of a nonprobationary employee unless staff reduction is necessary or good cause exists for nonrenewal.

In April 1977, when plaintiff was re-elected as Registrar of the North Campus, he had completed not only his initial probationary period as a teacher but also his probationary period as Registrar. Plaintiff's contract as Registrar for the 1977-78 academic year was not a probationary contract. Testimony of W. L. "Levi" Smallwood; Testimony of W. R. Davison; Testimony of Charles Ray Ogden; Testimony of John R. Johnson.

13. From October, 1976 until April, 1977, plaintiff engaged in a sexual affair with Martha Paye, the librarian of the North Campus of San Jacinto Junior College. Although plaintiff and the librarian worked in the same building, he did not contact her concerning personal matters during their working hours. Plaintiff frequently went to the library for coffee, as did other faculty members; however, he did not increase the frequency or extend the duration of those visits as a result of his relationship with the librarian. Plaintiff did not neglect his duties as Registrar to pursue his affair with the librarian. Stipulation; Testimony of John R. Johnson; Testimony of Martha Paye.

14. Plaintiff's wife, Norma S. Johnson, has been employed as an instructor at San Jacinto Junior College for sixteen years, and was teaching on the North Campus during the 1976-77 academic year. Testimony of Norma S. Johnson.

15. During that year plaintiff's wife knew nothing about her husband's affair until he told her on April 16, 1977. Plaintiff's father had died on April 13, 1977, and, as a result of events arising out of that death, plaintiff was compelled to inform his wife of the affair. Stipulation; Testimony of John R. Johnson; Testimony of Norma S. Johnson.

16. After she was told about the affair, Norma S. Johnson left town without telling plaintiff. She did not teach her classes on April 18-20, 1977, but she left materials on her supervisor's desk, requesting that another teacher be substituted for her classes on those dates. Stipulation.

17. On the evening of April 18, 1977, after plaintiff discovered his wife had left, he made several telephone calls to try and locate her. Of the people with whom he talked, none indicated any awareness of plaintiff's personal problems, and none was informed of said problems by plaintiff. Testimony of John R. Johnson.

18. On the evening of April 18, 1977, plaintiff discussed the affair and consequent problems in his marriage with his minister. Testimony of John R. Johnson.

19. On April 19, 1977, plaintiff met privately with defendant Spencer in Spencer's office and apprised Spencer of his affair and his wife's having left town. Plaintiff indicated to Spencer the private nature of the meeting by closing Spencer's office door before beginning discussion. Spencer's acknowledged custom was to conduct any proceedings in his office with the door open unless the meeting involved private matters which necessitated closing the door. Stipulation; Testimony of John R. Johnson; Testimony of Thomas Spencer.

20. The College has a policy of encouraging faculty to discuss personal problems with an administrator rather than bringing them up at faculty meetings. Although plaintiff asserts that said policy required him to discuss the affair with Spencer, the Court finds that the policy cannot be construed to impose such a requirement and that plaintiff did not so interpret the policy. The Court finds that on April 19, plaintiff went to Spencer as a friend rather than pursuant to the policy. Further, plaintiff had been encouraged by his minister to discuss the affair with Spencer. Testimony of John R. Johnson; Testimony of Thomas Spencer; Testimony of Charles Ray Ogden; Defendants' exhibit 4/Plaintiff's exhibit 6.

21. Plaintiff opened the April 19 discussion by telling Spencer that rumors about

plaintiff and the librarian were circulating on the South Campus, and plaintiff wanted to tell Spencer about the situation before Spencer heard it from another source. Testimony of John R. Johnson; Testimony of Thomas Spencer.

22. On April 21, 1977, plaintiff met privately with Edwin Lehr, Vice President of the North Campus, and informed him of plaintiff's affair with the librarian. Prior to plaintiff's telling Lehr about the affair, Lehr had known only that plaintiff was experiencing some personal problems, but he did not know specific details. Testimony of John R. Johnson; Testimony of Edwin Lehr.

23. On April 23, 1977, plaintiff met with the librarian to inform her that he had decided to remain with his wife. Plaintiff then reported his reconciliation with his wife to Spencer in his office. This second meeting with Spencer also was private. When plaintiff arrived at Spencer's office for the meeting, Lehr was leaving Spencer's office, but plaintiff was not told what Lehr and Spencer had been discussing. Testimony of John R. Johnson; Testimony of Martha Paye.

24. On or about April 25, 1977, the librarian went to speak with Spencer at his request. Spencer had asked both plaintiff and another faculty member to tell the librarian that he wanted to talk with her. During the private meeting, the librarian informed Spencer that she would resign because she could not work among colleagues who knew her personal situation. Although Spencer told her she need not resign, she persisted in her decision. Testimony of Martha Paye; Testimony of John R. Johnson; Testimony of Thomas Spencer.

25. On May 2, 1977, the Board of Regents of defendant College discussed plaintiff's situation in closed executive session. Spencer initiated the discussion, and he responded to the Board's questions by repeating what plaintiff had told him. The Board instructed Spencer to ask plaintiff to resign his position as Registrar. Although plaintiff had been present at the open session of the meeting, he was not present during the closed executive session when he was discussed. Testimony of Thomas Spencer; Testimony of Charles Ray Ogden.

26. On May 6, 1977, plaintiff again met privately with Spencer. During that meeting, Spencer informed plaintiff of three possible alternatives: (1) plaintiff could resign as Registrar; (2) plaintiff could be reassigned to teach History; or (3) plaintiff could remain as Registrar. Plaintiff told Spencer that he wished to continue as Registrar, and Spencer asked plaintiff to write a letter so indicating. Plaintiff wrote the letter on May 11, 1977, and indicated therein that he would like to address the Board if Spencer thought such action would be desired by the Board. Testimony of John R. Johnson; Testimony of Thomas Spencer; Plaintiff's exhibit 4/Defendants' exhibit 11.

27. On May 10, plaintiff's wife met with Spencer and informed him that she and her husband had reconciled. In response to her inquiry, Spencer told her that he perceived no reason why plaintiff's employment situation should be affected by the past events. Testimony of Norma S. Johnson; Testimony of Thomas Spencer.

28. On May 18, 1977, Spencer told plaintiff by telephone that the Board had met on May 16, 1977, and that the members wanted plaintiff to submit a letter requesting resignation as Registrar and reassignment as a history teacher. A few days later, plaintiff notified Spencer that he would not resign. Testimony of John R. Johnson; Testimony of Thomas Spencer.

29. Between April 16, 1977, and June 6, 1977, plaintiff personally told the following people about his affair with the librarian: his wife; Spencer; Lehr; Anders; his minister; and Dr. Nichols, his private physician. Plaintiff's wife told two other people about plaintiff's affair: Mrs. Tex Adams and Mrs. Birney. Testimony of John R. Johnson; Testimony of Norma S. Johnson.

30. On June 6, 1977, the Board of Trustees of San Jacinto Junior College passed Motion No. 3548, changing plaintiff's assignment from Registrar to history teacher. Plaintiff was notified of the change in his

status by letter from Spencer on June 7, 1977, and informed therein that his current contract salary of $20,417.00 was to be paid for the term of his current contract, July 1, 1977 to June 30, 1978. Testimony of Thomas Spencer; Testimony of John R. Johnson; Plaintiff's exhibit 4/Defendants' exhibits 12, 13.

31. Although plaintiff worked as a teacher in the 1977–78 academic year for the same base salary he would have received as Registrar, plaintiff did not get the twelve percent increase he would have received as Registrar that year. In the following academic years, plaintiff received less in base salary as a teacher than he would have received as Registrar. As Registrar, plaintiff was responsible for maintaining student records and grades, counseling students concerning their academic programs, and representing the College as a speaker in various career programs. Plaintiff has none of those responsibilities as a history teacher, with the exception of counseling students concerning their problems with courses he teaches. Testimony of John R. Johnson; Testimony of John Nichols, M. D.; Testimony of Thomas Spencer; Testimony of Charles Ray Ogden; Defendants' exhibit 4/Plaintiff's exhibit 6; Defendants' exhibit 34.

32. Plaintiff has received the following salaries from defendant San Jacinto Junior College.

| DATE | POSITION | SALARY | |
|------|----------|--------|---|
| 1974–75 | Registrar | $17,261.00 | |
| 1975–76 | Registrar | 19,081.00 | |
| 1976–77 | Registrar | 20,417.00 | |
| 1977–78 | Teacher | 20,417.00 | |
| 1978–79 | Teacher | 21,116.81 | (10–½ mos. as teacher) |
| 1979–80 | Teacher | 23,029.29 | (contracted 10–½ mos.) |

Stipulation.

33. If plaintiff had retained the position of Registrar, he would have earned the following amounts: 1977–78, $22,867.04; 1978–79, $24,239.06; 1979–80 $25,935.79. Thus, the differences between the salary plaintiff received as a teacher and what he would have earned as Registrar are as follows: 1977-78, $2,450.04; 1978–79, $3,032.25; 1979–80, $2,906.50.

34. When the Board decided to demote plaintiff, the members had no evidence before them of any ineffectiveness of plaintiff as Registrar. No complaints about plaintiff's job performance had been registered prior to the Board's decision. Spencer testified that he recommended to the Board that action be taken against the plaintiff in part because Spencer felt that plaintiff should assume his share of responsibility for the affair and not let sole responsibility rest with the librarian, who had resigned. Some of the Board members wanted to fire plaintiff; however, that action ultimately was considered too harsh because of plaintiff's long, previously unblemished record with the College, and because of plaintiff's age. The Board decided instead to demote plaintiff, for the following reasons: (1) he refused voluntarily to resign and request reassignment; (2) the extra–marital affair was immoral and unethical and plaintiff thereby had breached the trust the Board placed in him as Registrar, the responsibilities of which included representing the College to students and to the public; (3) plaintiff's conduct violated the professional conduct policy of the College; and (4) plaintiff's affair with the librarian had caused her to resign, causing the College inconvenience in having to recruit a new librarian. Although another reason given for plaintiff's demotion was that his conduct prevented him from presenting a responsible image for students to emulate, the Court finds that reason unpersuasive inasmuch as plaintiff has much more direct contact with students as a teacher than he had as Registrar. Testimony of Thomas Spencer; Testimony of Charles Ray Ogden; Testimony of W. L. "Levi" Smallwood; Testimony of F. G. Anders; Testimony of John Nichols, M. D.

35. The Court finds that, had plaintiff not confessed to the affair, the Board would not have felt compelled to take nor would they have taken any action against him. Rumors previously had circulated on the campuses concerning similar unprofessional conduct of other administrators. No action had been taken against those administrators because the Board members do not

investigate mere rumors, and because, in some instances, the people had denied engaging in unprofessional conduct. No evidence of unprofessional conduct was introduced concerning anyone other than plaintiff. Plaintiff was demoted because he confessed to his unprofessional conduct, and thereafter he refused to resign when requested to do so. Testimony of Charles Ray Ogden; Testimony of Thomas Spencer; Testimony of W. L. "Levi" Smallwood; Testimony of F. G. Anders; Testimony of John Nichols, M. D.

36. Defendant College has a policy governing professional conduct which was in effect during the 1976–77 academic year and which plaintiff violated by his extramarital affair with the librarian:

"College instruction is recognized as a profession. Faculty members are expected to accept responsibilities in practicing, developing and promoting high standards of moral, ethical and professional conduct. The image of any faculty member, at all times should be such that any student striving to emulate same could be assured of being a good, stable citizen."

Defendants' exhibit 4 at 13/Plaintiff's exhibit 6 at 3.

The policy concerning professional conduct enables the College to maintain a high standard for students and to gain the respect and support of the community. Plaintiff knew at the time of the affair that his conduct violated the policy. Plaintiff felt, however, that no action would be taken against him for the following reasons: (1) none of the persons about whom he had heard rumors had been censured; and (2) he knew of others who had discussed personal problems with Spencer and no action ever had been taken against them. Testimony of W. L. "Levi" Smallwood; Testimony of Thomas Spencer; Testimony of Charles Ray Ogden; Testimony of John R. Johnson; Testimony of Norma S. Johnson.

37. Plaintiff requested of Spencer and Anders in his individual meeting with each, an opportunity to appear before the Board of Regents and explain that he felt the affair had no effect on his functioning as Registrar. Plaintiff was present at the open portion of the Board meeting on June 6, 1977, when the decision to reassign him was announced. Plaintiff, however, had been given no opportunity to appear before the Board prior to their decision. Testimony of John R. Johnson; Testimony of Thomas Spencer; Testimony of F. G. Anders.

38. During the 1976–77 academic year, defendant College had in effect a "Due Process Policy" as follows:

"An employee of San Jacinto College who has a specific complaint or request is entitled to either an open or closed hearing before the Board of Regents. This hearing will be granted only after the employee has exhausted all appeals through the normal chain of command leading up to the Board."

Defendants' exhibit 4 at 17/Plaintiff's exhibit 6 at 9.

Prior to the meeting of June 6, 1977, plaintiff had complied with the policy insofar as he had met with Spencer concerning plaintiff's future at the College. He had not met with Edwin Lehr to discuss the Board's decision to ask him to resign. When plaintiff requested of Spencer and Anders that he be allowed to come before the Board, however, neither of them directed plaintiff to go through the "chain of command". The Board members were aware not only that plaintiff effectively had exhausted his appeal by talking with Spencer, but also that plaintiff wished to explain to the Board that his effectiveness as Registrar was unaffected by the affair. Nevertheless, plaintiff was denied an opportunity to present his explanation prior to the Board's rendering its decision on June 6, 1977. Testimony of John R. Johnson; Testimony of Thomas Spencer; Plaintiff's exhibit 4/Defendants' exhibit 11.

39. On or about June 26, 1977, plaintiff moved out of his office on the North Campus and thereafter took his annual vacation leave. On July 11, 1977, plaintiff received his teaching assignment. Testimony of John R. Johnson.

40. On July 12, 1977, Spencer announced by posted memorandum that the position of Registrar of the North Campus was vacant. Plaintiff's exhibit 4/Defendants' exhibit 14.

41. On August 3, 1977, plaintiff, through his attorney, requested of Spencer that the Board accept Spencer's recommendation that plaintiff be reinstated to the position of Registrar, or that plaintiff be given a hearing before an impartial panel on the subject of reinstatement. Plaintiff's attorney was advised by the attorney for the College that plaintiff would first have to have a conference with Edwin Lehr. That conference was held, and no decision was rendered by Lehr; plaintiff's attorney was advised that the next step was to appeal to Spencer. After that conference was held, plaintiff's attorney, by letter to the attorney for the College. requested an open hearing before the Board of Regents. The hearing first was scheduled on November 21, 1977, but because plaintiff's attorney could not be present on that date, the hearing was postponed. Stipulation; Plaintiff's exhibit 4/Defendants' exhibit 15.

42. By letter dated November 17, 1977, the attorney for the College forwarded to plaintiff's attorney a copy of plaintiff's personnel file, names of witnesses and summaries of their testimony, copies of the transcripts of the hearings before Spencer and Lehr, and the charge against plaintiff. On or about November 25, 1977, the attorney for the College forwarded to plaintiff's attorney a summary of the testimony of an additional witness who would testify at the hearing. A hearing was finally scheduled and held on March 20, 1978. Stipulation; Defendants' exhibit 32/Plaintiff's exhibit 3C.

43. At the request of the plaintiff, the hearing was commenced as an open meeting. Shortly after the chairman had turned the meeting over to the attorney for the College, plaintiff's attorney requested that the meeting be closed to the public. Thereafter, all witnesses were sworn and instructed on the rule of exclusion, and the Board went into closed, executive session to conduct the hearing. The hearing lasted two nights and at all times remained closed to the public. Defendants' exhibit 32/Plaintiff's exhibit 3C; Testimony of John R. Johnson.

44. During the hearing before the Board of Regents plaintiff was afforded an opportunity to confront and cross–examine witnesses against him. He and other witnesses testified on his behalf. He was represented by an attorney, and a transcript of the proceedings was made. Defendants' exhibit 32/Plaintiff's exhibit 3C.

45. On March 23, 1978, the following article appeared in the "News Summary" portion of the *Pasadena Citizen* :

"The Board of Regents of San Jacinto College has heard testimony for the past two nights concerning North Campus teacher John R. Johnson.

"Johnson is the former registrar of the North Campus, at I–10 and Uvalde, but was removed from that position and is now a part time history teacher at the campus. He requested a hearing to protest the change in position.

"The charge against Johnson involves morals, said Dr. Thomas Spencer, president of the College. The hearing, originally scheduled to be public, was changed to a closed–door hearing at the request of Johnson's lawyer, Larry Watts.

"Acting president of the board of regents Wayne Slovacek said he had no idea when a decision would be reached."

*Pasadena Citizen*, p. 1, col. 1 (March 23, 1978). Although Spencer denied that he had told the reporter that the charge involved morals, the greater weight of the credible evidence indicates that Spencer was the source of that information. Plaintiff's exhibit 1: Deposition of Mary Ann Cook, p. 8 1.2–p. 9 1.10, p. 10 11.2–13, p. 18 1.10–p. 21 1.11, p. 27 1.5–p. 30 1.15, p. 31 1.13–p. 32 1.17; Testimony of Thomas Spencer.

46. On or about April 3, 1978, the Board of Regents employed Johnson as a teacher in the history department under a one year contract for the 1978–79 school year. Stipulation.

47. On or about May 1, 1978, the Board officially reaffirmed their prior action of demotion.

48. On or about April 2, 1979, the Board of Regents employed Johnson as a teacher in the history department under a one year contract for the 1979–80 school year. Stipulation.

49. After the May 6, 1977 meeting with Spencer in which plaintiff was told his three alternatives, plaintiff began experiencing symptoms of stress: weight loss; nausea; diarrhea; and sleeplessness. Those symptoms continued for several months. The evidence established that those symptoms were attributable to defendants' actions, rather than to the death of plaintiff's father in April 1977, or to the problems associated with plaintiff's affair. Plaintiff and his wife both experienced sleeplessness again for some time after the article appeared in the *Pasadena Citizen*. Testimony of John R. Johnson; Testimony of Norma S. Johnson; Testimony of John Nichols, M.D.; Plaintiff's exhibit 5.

50. As a result of defendants' actions in depriving him of procedural due process, plaintiff sustained a loss of $2,450.04 in wages for the 1977–78 academic year. Inasmuch as plaintiff received a hearing before the expiration of the 1977–78 academic year, he is entitled to recover from defendants, jointly and severally, a prorated amount of that sum for the time between his unlawful demotion and the date of the hearing.

51. As a result of defendant Spencer's action in depriving plaintiff of substantive due process, plaintiff suffered mental anguish and is entitled to be compensated therefor. Further, inasmuch as the Court finds that Spencer acted in wanton disregard of plaintiff's right to a closed hearing, exemplary damages are warranted against Spencer.

52. As a result of defendants' actions in depriving plaintiff of substantive due process, and his First Amendment right to petition for redress of grievances, plaintiff suffered physical pain and mental anguish; he is entitled to be compensated therefor by

defendants, jointly and severally. Further, inasmuch as the Court finds that defendants, by the summary demotion procedure, acted in wanton disregard of plaintiff's constitutional rights, exemplary damages are warranted against defendants, jointly and severally.

53. The evidence at trial concerning the amount of actual damages incurred by plaintiff as a result of violations of his constitutional rights was insufficient to enable the Court to ascertain the proper amount of an award. The parties will submit memoranda regarding proof of damages to the Court within ten (10) days after entry of these Findings of Fact and Conclusions of Law.

### III. Conclusions of Law

1. The Court has jurisdiction over the subject matter of this cause pursuant to 28 U.S.C. § 1343 (1976). San Jacinto College is a "person" within the meaning of 42 U.S.C. § 1983 (1974). *See, e. g., Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Goss v. San Jacinto Junior College*, 588 F.2d 96 (5th Cir. 1979); *Hander v. San Jacinto Junior College*, 519 F.2d 273 (5th Cir.), *rehearing denied*, 522 F.2d 204 (5th Cir. 1975). Defendants Spencer, Anders, Davison, Ogden and Smallwood, each being sued individually and in his official capacity, are all "persons" within the meaning of Section 1983, in both their individual and official capacities. *See Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). As to all actions complained of in the instant cause, defendants Spencer, Anders, Davison, Ogden and Smallwood acted under color of law as officials of San Jacinto College. Refer to Findings 1–7.

2. In a school setting "demotion" has been defined by the Fifth Circuit as "any re–assignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he

held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, ...." *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1218 (5th Cir. 1969) (per curiam), *rev'd on other grounds and remanded sub nom., Carter v. West Feliciana School Board*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), *on remand*, 425 F.2d 1211 (5th Cir. 1970) (per curiam). The central value to be protected is responsibility; salary and title are not necessarily determinative. *Lee v. Russell County Board of Education*, 563 F.2d 1159, 1161 (5th Cir. 1977). The *Singleton* Court defined "demotion" in the context of requiring "demotions or dismissals [of school staff] caused by desegregation to be on the basis of objective and nondiscriminatory standards." *Lee v. Russell County Board of Education, supra*, at 1161. This Court is aware that "the strict requirements of *Singleton* [are not applicable] in the absence of desegregation related reductions [in school staff]." *Pickens v. Okolona Municipal Separate School District*, 527 F.2d 358 (5th Cir. 1976). *See Lee v. Tuscaloosa County Board of Education*, 591 F.2d 324 (5th Cir. 1979) (per curiam). Desegregation related reductions are not involved in the instant cause; however, in order to determine whether plaintiff was deprived of procedural or substantive due process, the Court must determine whether plaintiff's reassignment to history teacher was a demotion. The Court, therefore, refers to *Singleton* solely for guidance concerning whether defendants' actions in reassigning plaintiff are to be construed as their having demoted him, and the Court is not imposing the *Singleton* requirements on defendants. The Court concludes that plaintiff had fewer responsibilities as a teacher, and that his performing as a teacher required a lesser degree of skill than the position of Registrar which he previously had held. In addition, plaintiff suffered a decrease in salary as a result of the reassignment. Accordingly, the Court determines that plaintiff's reassignment was a demotion. Further, the Court concludes that the Board members intended plaintiff's reclassification to be a demotion. Refer to Findings 25–28, 30–36.

### A. Procedural Due Process

3. Plaintiff was demoted from Registrar to history teacher. In order to demonstrate that he was entitled to procedural due process before he could have been demoted, plaintiff must prove that he had a protectible property interest in continued employment as Registrar. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth, supra*, at 577, 92 S.Ct. at 2699. In *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Court found that "A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown. Yet absence of such an explicit contractual provision may not always foreclose the possibility that a teacher has a 'property' interest in re–employment." *Id.* 601, 92 S.Ct. at 2699. The *Perry* Court further explained that a written contract may be supplemented by other agreements implied from custom at the institution, *i. e.*, an "unwritten 'common law' in a particular university ...." *Id.* 602, 92 S.Ct. at 2700. *See also, Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976): "A property interest in employment can ... be created ... by an implied contract." *Id.* (footnote omitted). *Regardless* of the source of a property interest, the "sufficiency of a claim of entitlement must be decided by reference to state law." *United Steelworkers of America, AFL–CIO v. University of Alabama*, 599 F.2d 56, 60 (5th Cir. 1979), citing *Bishop v. Wood, supra*.

Plaintiff had been re–elected to the position of Registrar for the 1977–78 academic year, and he had accepted the position before he was reassigned as a

teacher. The Court concludes that the agreement, which consisted of the Board's recorded motion to re–elect plaintiff and plaintiff's acceptance, secured to plaintiff a contract as Registrar for the 1977–78 academic year. *See Gosney v. Sonora Independent School District*, 603 F.2d 522, 525 (5th Cir. 1979); *Stapp v. Avoyelles Parish School Board*, 545 F.2d 527, 532 (5th Cir. 1977). Plaintiff's contract was subject to the regulations adopted prior to his making the contract and published in the Faculty Handbook for the relevant academic year. *See, e. g., Romeike v. Houston Independent School District*, 368 S.W.2d 895, 896 (Tex. Civ.App.–Waco 1963, n.w.h.); *Arlington Independent School District v. Weekley*, 313 S.W.2d 929, 930 (Tex.Civ.App.–Fort Worth 1958, n.r.e.); *cf., Fazekas v. University of Houston*, 565 S.W.2d 299, 305 (Tex.Civ. App.–Houston [1st Dist.] 1978, n.r.e.), *appeal dismissed*, 440 U.S. 952, 99 S.Ct. 1487, 59 L.Ed.2d 765 (1979) (statutory provisions pertaining to plaintiff's employment with the University of Houston are part of plaintiff's contract as if they were expressly incorporated in it). When referring to an employee handbook to ascertain the employee's entitlement to a benefit, the Court must consider the handbook in its entirety rather than only isolated provisions thereof. *See United Steelworkers of America, AFL–CIO v. University of Alabama, supra*, at 60. The Court has considered the faculty handbook in conjunction with the testimony concerning the established custom at the College, which was to ensure job security for non–probationary employees. Accordingly, the Court concludes that the policy concerning reassignment of administrative personnel as provided in the handbook was mutually understood to be applicable only between the expiration of one contract and the offer of a subsequent one. The particular provision was not understood to be applicable during an academic year for which a faculty member already had a contract. The Court further concludes that the "common law of the industry" created an implied term of plaintiff's contract whereby he had a legitimate expectation of and claim of entitlement to continued employment as Registrar for the 1977–78 academic year, once he had accepted the position. *See Bishop v. Wood, supra; Perry v. Sindermann, supra; Glenn v. Newman*, 614 F.2d 467, 471 (5th Cir. 1980).

■ Plaintiff was employed on a yearly contract. The Court, therefore, concludes that he had no legitimate expectation of being employed as Registrar beyond the expiration of his 1977–78 contract. Thus, plaintiff established a property interest in his position as Registrar only for the 1977–78 academic year. *Cf. Henry v. Texas Southern University*, No. 77–H–904 (S.D. Texas March 17, 1980) (unreported) (non–academic staff member employed on yearly contract proved actual injury in being deprived of position in Bursar's office during term of one academic year); *Sanchez v. Board of Regents of Texas Southern University*, No. 75–H–1407 (S.D.Tex.1979) (unreported) (non–academic staff member employed on yearly contract had no legitimate expectation of continued employment beyond the first year following his unlawful discharge). Refer to Findings 9, 10, 11, 12.

■ 4. When a constitutional interest is at stake, the plaintiff is entitled to procedural due process protection in conjunction with being deprived of that interest. *See, e. g., Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). The due process protection that must be accorded consists of notice and an opportunity for a hearing. The timing and content of the notice and hearing which are constitutionally sufficient in a particular set of circumstances are determined by a balancing of individual and governmental interests. *See Morrissey v. Brewer, supra; Glenn v. Newman*, 614 F.2d 467, 472 (5th Cir. 1980); *compare Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) *with Goldberg v. Kelly, supra*. The Fifth Circuit, however, has obviated any necessity for the Court to engage in a bal-

ancing of interests on the instant facts. The minimum procedural requirements for termination of a teacher for cause clearly were delineated in *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970), cited in *Gosney v. Sonora Independent School Dist.*, 603 F.2d 522, 525 (5th Cir. 1979). The *Ferguson* Court prescribed the following minimum requirements "when a teacher who is to be terminated for cause opposes his termination . . . :

(a) he [must] be advised of the cause or causes for his termination in sufficient detail to fairly enable him to show any error that may exist,

(b) he [must] be advised of the names and the nature of the testimony of witnesses against him,

(c) at a reasonable time after such advice he must be accorded a meaningful opportunity to be heard in his own defense,

(d) that hearing should be before a tribunal that both possesses some academic expertise and has an apparent impartiality toward the charges.

*Ferguson v. Thomas, supra*, at 856. The Fifth Circuit further has established that the opportunity for a hearing must be provided *"before* the nonrenewal of a public school employee if the decision deprives the employee of a protected liberty or property interest." *Gosney v. Sonora Independent School Dist., supra*, at 525 (emphasis added), citing *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); *Stapp v. Avoyelles Parish School Board*, 545 F.2d 527, 532–35 (5th Cir. 1977).

 Plaintiff had a protectible property interest in his position as Registrar during the 1977–78 academic year; he, therefore, was entitled to notice and a hearing before he could be deprived of that interest. The Board made an initial determination concerning plaintiff's property interest without plaintiff's knowledge; accordingly, plaintiff had no notice within the meaning of *Ferguson*. *See also Mathews v. Eldridge, supra; Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935

(1974); *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer, supra; Goldberg v. Kelly, supra*. Moreover, once the plaintiff became aware of the Board's initial action, he requested an opportunity to address the Board before their decision to demote him from Registrar became final. Plaintiff's request was made in compliance with the due process policy of the College and should have entitled him to a hearing pursuant to that policy. In spite of his request, plaintiff was denied any opportunity for a hearing prior to the defendants' depriving him of his protectible property interest. The Court therefore concludes that by their actions of May–June, 1977, the defendants violated their own policy as well as constitutionally required minimum procedures, and thereby deprived plaintiff of his Fourteenth Amendment right to procedural due process. *See Fer-. guson v. Thomas, supra*, at 856; *Burnaman v. Bay City Ind. School District*, 445 F.Supp. 927, 936 (S.D.Tex.1978); *cf. Cochran v. Chidester School District of Ouachita County, Arkansas*, 456 F.Supp. 390 (W.D.Ark.1978) (Court held that termination of teacher's existing contract, pursuant to unannounced morals standards and without notice and pretermination hearing, violated teacher's right to procedural due process; school board had held a special meeting without teacher's knowledge wherein the members decided that the teacher, who was an unwed parent, should be asked to resign or be fired; the teacher subsequently was fired).

 Defendants did afford plaintiff a hearing approximately one year after he was demoted from his position of Registrar. The hearing originally was scheduled approximately five months after the Board's action to demote plaintiff, but plaintiff requested postponement. In some "extraordinary situations where some valid governmental interest is at stake that justifies [it]," *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971), the Supreme Court has concluded that a post–deprivation hearing is constitutionally sufficient in circumstances where only

property interests are involved. *See, e. g., Mathews v. Eldridge, supra; Goss v. Lopez, supra; Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (plurality opinion); *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). In cases where the hearing may occur subsequent to infringement of a protected interest, the Supreme Court has required that the hearing be held promptly and before extended deprivation. *See, e. g., Goss v. Lopez, supra; Arnett v. Kennedy, supra; Gagnon v. Scarpelli, supra; but see Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (the necessary hearing is to be obtained by resort to criminal or tort proceedings in state courts). Even had plaintiff been afforded a hearing on the date it originally was scheduled, the Court concludes that the five–month delay does not comport with the promptness required in the above cases.

■■■ In all other respects, however, the post–deprivation hearing met the requirements of *Ferguson v. Thomas, supra.*[1] Thus, defendants have provided to plaintiff the equivalent of what the Court could have ordered them to provide. *See Perry v. Sindermann,* 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972) ("Proof of . . . a property interest would not, of course, entitle [plaintiff] to reinstatement. But such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency."); *cf. Zimmerer v. Spencer,* 485 F.2d 176 (5th Cir. 1973) ("In the present case, the District Court . . . not only inquired into the issue of whether Dr. Zimmerer had a property interest but also went to the merits of the controversy . . . and concluded that there were 'valid . . . reasons for the Board's actions.' Thus the court had gone past the point of remanding to the Board, as contemplated by *Perry,* to enable that body to inquire into the merits of the dispute." *Id.* 179). Inasmuch as plaintiff proved a protectible property interest in the position of Registrar for the 1977–78 academic year, and proved actual injury as a result of deprivation of that interest, he has demonstrated his entitlement to remedial compensation for the deprivation. *See Carey v. Piphus,* 435 U.S. 247, 262–65, 98 S.Ct. 1042, 1051–53, 55 L.Ed.2d 252 (1978). That compensation is awarded to plaintiff against defendant San Jacinto Junior College, and against all other defendants in both their official and individual capacities. Refer to Conclusion 9. Plaintiff's remedy should include back pay for the period between his demotion and his post–deprivation hearing, which was held prior to the expiration of the 1977–78 academic year. *See Glenn v. Newman, supra,* at 473. The award of back pay cannot extend beyond the time of the post–deprivation hearing because plaintiff had no reasonable expectation of continued employment as Registrar beyond the 1977–78 academic year, and defendants cured the deprivation of procedural due process by holding the March 1978 hearing before the next consecutive year in which plaintiff could have been employed as Registrar. *See Glenn v. Newman, supra,* at 472.

■■■ The back pay relief to which plaintiff is entitled for denial of procedural due process consists of lost wages including the value of any employment benefits lost as a result of the unlawful demotion, less any actual subsequent earnings of plaintiff in regular daytime employment during that period. Plaintiff is not entitled to reinstatement as Registrar because his protectible property interest in being Registrar extended through only one academic year and his ineligibility for the position was reaffirmed in a due process hearing before the next academic year. *See, e. g., Zimmerer v. Spencer, supra.* Refer to Findings 10, 11, 12, 25, 26, 28, 30–38, 41–44, 46, 48, 49.

---

1. The only requirement about which some question might be presented is whether the tribunal possessed "an apparent impartiality toward the charges." *Ferguson v. Thomas,* 430 F.2d 852, 856 (5th Cir. 1970). The Court finds that the Board was sufficiently impartial to comply with procedural due process. *See Kaprelian v. Texas Woman's University,* 509 F.2d 133, 138 (5th Cir. 1975); *Duke v. North Texas State University,* 469 F.2d 829, 840–41 (5th Cir.), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973).

5. Regardless of whether plaintiff had a property interest in his job classification as Registrar, plaintiff could be entitled to Fourteenth Amendment due process protection for a liberty interest in his reputation if the defendants subjected him to a badge of infamy in the course of changing his job classification to teacher. *See Dennis v. S. & S. Consolidated Rural High School District,* 577 F.2d 338, 339 (5th Cir. 1978). In order to establish entitlement to due process protection in the context of a protectible liberty interest in his reputation, plaintiff must prove "that in the course of [changing his job classification, defendants] prepared a report [or made a statement], without giving him notice and an opportunity to be heard which was (a) false, (b) stigmatizing, and (c) published." *Huffstutler v. Bergland,* 607 F.2d 1090, 1092 (5th Cir. 1979) (per curiam) (footnotes omitted), citing *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Plaintiff failed to sustain his burden of proving that the information in the press release of March 23, 1978 was false. With regard to the Board's and Spencer's activities concerning plaintiff in May and June 1977, plaintiff failed to prove that any statement concerning his affair which was made at a Board meeting was false. Accordingly, plaintiff established no protectible liberty interest in his reputation, and further inquiry by the Court into what process might be due pursuant to the Fourteenth Amendment is unnecessary. *See, e. g., Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Board of Regents v. Roth, supra* ; *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (procedural due process analysis has two steps: the first is ascertaining whether a protectible interest exists; the second is assessing what procedures are necessary to protect an implicated interest); *Webster v. Redmond,* 599 F.2d 793, 796–97 (7th Cir. 1979) ("If no protectable [sic] liberty or property interest is found

to be implicated, no process is 'due' and no reasons or hearing need be given." *Id.* But see, *Board of Curators v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Smith v. Organization of Foster Families,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (in both cases the Court assumed, rather than found, that a protectible interest existed, and then assessed procedures necessary to protect those interests). Refer to Findings 13, 16, 18, 19, 22, 29, 30, 37, 42–45.

### B. Substantive Due Process

6. The due process policy of the College guaranteed to plaintiff the opportunity for a closed hearing in which to air his grievances. In addition, the Texas Open Meetings Act, Tex.Rev.Civ.Stat.Ann. art. 6252–17 § 2(g) (Vernon 1974) ensures that meetings involving certain personnel decisions about public employees will be closed unless the employee requests a public hearing. The plaintiff requested and received a closed hearing in March 1978; however, subsequent to the conclusion of the hearing and before a final decision was rendered, an article appeared in the community newspaper which revealed the substantive focus of the meeting and identified defendant Spencer as the source of the information.

Plaintiff asserts that his professional and personal reputation, considered in light of his right to have his grievances aired privately, constitutes a constitutionally protectible liberty interest. The Court has previously determined that plaintiff had no protectible liberty interest in his professional reputation because the published information of which he complains was not false. *See Huffstutler v. Bergland,* 607 F.2d 1090, 1092 (5th Cir. 1979) (per curiam). The Court, however, concludes that plaintiff did have a constitutionally protectible property interest in having a closed hearing by virtue of his reasonable expectation that he could rely on state law and school policy to ensure such. *See, e. g., Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92

S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

▌▌▌ Although Spencer's action in revealing the focus of the hearing was not directly violative of either school policy or the Open Meetings Act, his action did infringe on plaintiff's protectible property interest in having his privacy assured and therefore Spencer's action must be analyzed pursuant to substantive due process tests. Plaintiff's interest is a fundamental right, *cf. San Antonio School District v. Rodriguez*, 411 U.S. 1, 29, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973) (the issue in equal protection analysis for determining the level of judicial scrutiny of legislation is whether an interest is "a fundamental right, in the sense that it is among the rights and liberties protected by the Constitution . . ." *Id.* 29, 93 S.Ct. 1294); therefore, strict judicial scrutiny is triggered. *See Griswold v. Connecticut*, 381 U.S. 479, 497, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring). In order to justify abridging plaintiff's interest, defendant Spencer must prove that his action was necessary to further a compelling institutional interest. *See Griswold v. Connecticut, supra.* The Court concludes that defendant Spencer failed to meet his burden; accordingly, the Court concludes that, by his action of telling the press that plaintiff's hearing involved "morals", defendant Spencer violated plaintiff's Fourteenth Amendment right to substantive due process, and thereby caused plaintiff injury. Spencer is liable for said violation in both his official and individual capacities. Refer to Conclusion 9.

The other defendants may not be held liable for Spencer's action unless they were personally involved. *See Watson v. Interstate Fire & Cas. Co.*, 611 F.2d 120 (5th Cir.

1980). The Court concludes that none of the other defendants participated in Spencer's action and, therefore, none other than Spencer can be held liable for the publication in derogation of plaintiff's constitutionally protected right. Refer to Findings 43, 45.

7. Plaintiff contends that defendants invaded his constitutional right of privacy by their actions in demoting him because of his extra–marital affair with the librarian. Plaintiff thereby asserts not only that his extra–marital relationship was a fundamental right protected by the Constitution, but also that defendants' invasion of that right was not necessary to effectuate a compelling institutional interest. In the alternative, plaintiff asserts that defendants' enforcement against him of the San Jacinto Junior College professional conduct policy constituted a violation of his right to substantive due process. Inasmuch as plaintiff had a protectible property interest in continued employment as Registrar for the 1977–78 academic year, by his alternative claim, plaintiff challenges whether the professional conduct policy was rationally related to a legitimate institutional interest. Additionally in the alternative, he contends that the policy was vague and that even if sufficiently specific, the policy was applied unequally.

Plaintiff's first contention requires analysis of whether any extra–marital relationship between consenting adults is embraced within the scope of the constitutional right of privacy.[2] The Supreme Court early began to define the contours of a protectible liberty interest encompassing the right of persons freely to make certain decisions concerning marriage, procreation and child–rearing. *See, e. g., Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 45

---

**2.** The facts of the instant case do not require inquiry concerning the right of privacy directly protected by the Fourth Amendment, which is described as the right of an individual to be free of governmental surveillance and intrusion in the course of criminal investigation, *see, e. g., Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *see also, Whalen v.*

*Roe*, 429 U.S. 589, 599 n.24, 604 n.32, 97 S.Ct. 869, 876 n.24, 878 n.32 (1977). Accordingly, the Court herein discusses only the right of privacy which is said to arise out of the "Fourteenth Amendment's concept of personal liberty." *Whalen v. Roe, supra*, at 598 n.23, 97 S.Ct. at 876 n.23, citing *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

S.Ct. 571, 69 L.Ed. 1070 (1925); *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). The foundation underlying those recognized interests is recognition of a "private realm of family life [into] which the state cannot enter." *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1943). Also encompassed with the protection of that realm of privacy are decisions of both married and single persons concerning child bearing, *see Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); interracial marriage, *see Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); contraception, *see Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (plurality opinion); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (plurality opinion); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (plurality opinion); and abortion, *see Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

The limits of the Fourteenth Amendment right of privacy, *see Whalen v. Roe*, 429 U.S. 589, 598 n.23, 97 S.Ct. 869, 875 n.23, 51 L.Ed.2d 64 (1977), are not rigidly defined; however, some contours may be derived from the case law. The Supreme Court has described the cases protecting the Fourteenth Amendment privacy right as involving "at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." [3] *Whalen v. Roe, supra*, at 598–600, 97 S.Ct. at 876 (footnotes omitted). This Court perceives the privacy cases which protect aspects of independent decision making as amenable to division into three distinct classifications of protectible interests: (1) the right of marital privacy which extends to the physical and emotional intimacies between husbands and wives, *see, e. g., Loving v. Virginia, supra; Griswold v. Connecticut, supra* ; (2) the right of family/home privacy which encompasses not only decisions concerning raising children but also choices concerning family living arrangements, *see, e. g., Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Pierce v. Society of Sisters, supra; cf. Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (statute prohibiting private possession of obscene materials in one's home violated First and Fourteenth Amendments, and also implicated the right of privacy); and (3) the right of individual privacy which encompasses decisions concerning the integrity and autonomy of one's body, *see e. g., Carey v. Population Services International, supra; Planned Parenthood of Central Missouri v. Danforth, supra; Roe v. Wade, supra; Skinner v. Oklahoma, supra.*[4] Determination of family or individual rights does not rest on marital status; in contrast, however, the right of marital privacy specifically arises out of the tradition-

---

**3.** Although the former interest is clearly defined and distinguishable from the latter in the context of certain cases, *see, e. g., Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *California Bankers Association v. Shultz*, 416 U.S. 21, 78–79, 94 S.Ct. 1494, 1525–1526, 39 L.Ed.2d 812 (1974) (Powell, J., concurring), in other cases the interest asserted encompasses both the right to make independent decisions and the right not to have private affairs made public by the government. *See, e. g., Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1963).

**4.** In the context of determining that a married woman has a right to terminate her pregnancy, District Judge Garth analyzed the right to privacy issues by distinguishing between two lines of Supreme Court precedent. Judge Garth separated the decisions into those pertaining to marital privacy and those pertaining to family privacy. *See Young Women's Christian Association of Princeton v. Kugler*, 342 F.Supp. 1048, 1077 (D.N.J.1972) (Garth, J., concurring in part and dissenting in part), *aff'd*, 493 F.2d 1402 (3rd Cir.), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 885 (1974).

al marriage relation which is rooted in the conscience and concepts of society. *See, e. g., Griswold v. Connecticut, supra,* 381 U.S. at 495–96, 498–99, 85 S.Ct. at 1689 (Goldberg, J., concurring); *Poe v. Ullman,* 367 U.S. 497, 552–54, 81 S.Ct. 1752, 1781–82, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting from dismissal of appeal). Although he has not specifically so characterized his assertion, plaintiff asks the Court not only to create a hybrid right which arises out of both the marital and individual components, but also to extinguish reliance on an extra-marital/marital distinction in doing so. In essence, the plaintiff asks the Court to conclude that he has a fundamental right to privacy which encompasses an unlimited right to do with his body as he pleases, including engaging in the intimacies of sexual relations outside of his marriage. Although some judicial support for plaintiff's assertion can be found, *see Krzyzewski v. Metropolitan Government of Nashville,* 14 E.P.D. ¶ 7726, at 5575 (M.D.Tenn.1976), the Court concludes that the distinctions found in the privacy cases do not support such a conclusion. *Cf. Hollenbaugh v. Carnegie Free Library,* 439 U.S. 1052, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978) (Marshall, J., dissenting from denial of certiorari) (in the context of petitioners' having been discharged for living in an open adulterous relationship, Justice Marshall concluded that the interests asserted were related sufficiently to fundamental privacy rights and to fundamental rights of freedom of association that they should not have been reviewed pursuant to minimum equal protection scrutiny, but at least should have been balanced against a "substantial" state interest). The decisions, instead, indicate to the Court that the right of privacy in sexual intimacy is grounded on the marriage relation, and that the right of a single or married individual to do with his or her body as he or she pleases encompasses aspects incident to sexual intimacy, but currently does not protect the sexual relations themselves. *Cf. Drake v. Covington County Board of Education,* 371 F.Supp. 974, 979 (M.D.Ala.1974) (three–judge court) (in holding that the State violated plaintiff's constitutional right of privacy by bas-ing cancellation of her employment contract on evidence of her unwed pregnancy which was derived from her private communications with her physician, the Court cited *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) as authority for opining that "The [Supreme] Court has also recently declined to restrict the right of privacy in sexual matters to married couples. . . ." *Id.*). At this stage in the development of the right of privacy, the protection of actual sexual intimacy appears to be confined to those persons in the marital relationship. *See, e. g., Wilson v. Swing,* 463 F.Supp. 555 (M.D.N.C. 1978) ("adultery is not protected by the First Amendment's guarantee of freedom of association. . . . [and] it would be anomalous to find adulterous conduct to be protected by the right of association but not by the closely analogous right of privacy." *Id.* 563, citations omitted); *Hollenbaugh v. Carnegie Free Library,* 436 F.Supp. 1328 (W.D.Pa. 1977), *cert. denied,* 439 U.S. 1052, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978) (no fundamental privacy right exists for persons living together in adulterous relationship, *id.* 1334); *Doe v. Commonwealth's Attorney for City of Richmond,* 403 F.Supp. 1199 (E.D.Va. 1975) (three judge court), *aff'd mem.,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976) (statute criminalizing sodomy does not infringe on any fundamental right to privacy); *cf. Smith v. Price,* 616 F.2d 1371 (5th Cir. 1980) (Court assumed without deciding that adulterous relationship was protected either by right to freedom of association or by right to privacy, at 1375); *Lovisi v. Slayton,* 539 F.2d 349 (4th Cir. 1976), *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1977) (presence of onlooker in bedroom of married couple dissolved the couple's reasonable expectation of privacy; convictions for sodomy affirmed, *id.* 351–52); *Andrews v. Drew Municipal Separate School District,* 507 F.2d 611 (5th Cir. 1975) *cert. dismissed,* 425 U.S. 559, 96 S.Ct. 1752, 48 L.Ed.2d 169 (1976) (school board rule denying employment to unwed parents is denial of equal protection; Court left open whether the rule also infringed on right to privacy, *id.* 617);

*McConnell v. Anderson,* 451 F.2d 193 (8th Cir. 1971), *cert. denied,* 405 U.S. 1046, 92 S.Ct. 1312, 31 L.Ed.2d 588 (1972) (university could deny employment to homosexual where applicant demanded right to pursue activist role in implementing unconventional ideas and thereby foisted upon his employer tacit approval of his lifestyle); *Morgan v. City of Detroit,* 389 F.Supp. 922, 926 (E.D.Mich.1975) (while completed acts of prostitution, fornication and adultery may be consensual and therefore protected by the right of privacy, soliciting and accosting are not protected by that right); *Drake v. Covington County Board of Education, supra,* at 979 (state statute concerning cancellation of employment contract for immorality was applied to plaintiff in a manner which invaded her constitutional right of privacy where the cancellation of her contract was based on evidence of her unwed pregnancy which was solicited by the Superintendent from plaintiff's private physician without plaintiff's having given permission for her doctor to reveal such information); *Flores v. Secretary of Defense,* 355 F.Supp. 93, 96 (N.D.Fla. 1973) (Navy regulation concerning pregnancy was not concerned with moral aspects of unwed pregnancy and did not constitute an unconstitutional invasion of right to privacy); *Fisher v. Synder,* 346 F.Supp. 396, 400 (D.Neb. 1972), *aff'd,* 476 F.2d 375 (8th Cir. 1973) (the association of persons within one's home is protected by the right to privacy, and when no proof of impropriety existed, teacher could not be discharged because male guests spent nights in her home); *Commonwealth v. Bonadio,* —— Pa. ——, 415 A.2d 47 (1980) (state criminal statute prohibiting single adults from engaging in voluntary oral or anal sexual acts is violative of right to equal protection guaranteed by United States and Pennsylvania constitutions; Court assumed no fundamental interest was involved and did not engage in strict scrutiny of the classification). After examining this somewhat unevenly evolving area of the law, the Court concludes that plaintiff's extra–marital relationship is not protected within the scope of the constitutional right to privacy.[5] The plaintiff, therefore, must prove that his demotion was not rationally related to a legitimate institutional objective. *See, e. g., Harrah Independent School District v. Martin,* 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979); *Eisenstadt v. Baird, supra.* Inasmuch as the same level of scrutiny is required in analysis of the professional conduct policy, the Court now focuses on plaintiff's alternative claim which is directed at defendants' enforcement of that policy.

■ As a preliminary matter, the Court concludes that the professional conduct policy is not unconstitutionally vague as it was applied to plaintiff. *See Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *Smith v. Price,* 616 F.2d 1371 at 1379 n.10 (5th Cir. May 16, 1980); *Wishart v. McDonald,* 500 F.2d 1110 (1st Cir. 1974); *contra, Burton v. Cascade School District Union High School*

5. An alternative analysis is that plaintiff gave up any reasonable expectation of privacy he might have had inasmuch as he confessed his extra–marital affair to several persons. *See Lovisi v. Slayton,* 539 F.2d 349 (4th Cir. 1976), *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1977); *Wishart v. McDonald,* 500 F.2d 1110 (1st Cir. 1974).

In determining that the plaintiff's adulterous relationship is not constitutionally protected within the right of privacy, the Court acknowledges that the instant facts are similar to those of *Hollenbaugh v. Carnegie Free Library,* 439 U.S. 1052, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978) (Marshall, J., dissenting from denial of certiorari), in which Justice Marshall concluded that petitioners' rights to pursue an open adulterous relationship were related sufficiently to other fundamental privacy interests and to freedom of association that the rights should not be relegated to minimum equal protection scrutiny, but at least should be balanced against a "substantial" state interest. In so urging, Justice Marshall renewed his objection to the Supreme Court's adherence to a "rigid two–tier" model of equal protection analysis. As a central reason for his belief that the facts required more than minimum scrutiny, Justice Marshall emphasized that the Pennsylvania legislature had repealed its law prohibiting adultery. In the instant cause, the State legislature also has repealed its law criminalizing adultery. Tex. Penal Code tit. X, §§ 499–502 (repealed 1973), found in Tex.Penal Code Ann.Appendix, at 508–09 (1974).

*No. 5*, 512 F.2d 850 (9th Cir.), *cert. denied*, 423 U.S. 839, 96 S.Ct. 69, 46 L.Ed.2d 59 (1975). The plaintiff acknowledged that his conduct was proscribed by the policy.

 The professional conduct policy is intended to serve various institutional interests which the Court concludes are legitimate: (1) maintaining community respect for the College; (2) providing students high standards of behavior to emulate; and (3) instilling trust between personnel and the Board. The policy itself is a rational means of achieving those interests. Moreover, the enforcement of that policy against plaintiff subsequent to the March 1978 hearing was a rational means of effectuating the institutional interests. Plaintiff's affair was known to others: as Registrar, plaintiff had public speaking responsibilities in the community as a representative of the College; as a result of his breach of the trust placed in him by members of the Board, some of them lost confidence in his ability to function as Registrar.[6] Accordingly, the Court concludes that defendants' enforcement of the professional conduct policy against plaintiff by affirming his demotion in 1978 did not constitute an arbitrary and capricious action. *See Hollenbaugh v. Carnegie Free Library*, 436 F.Supp. 1328 (W.D.Pa.1977), *cert. denied*, 439 U.S. 1052, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978); *Wishart v. McDonald, supra; cf. Harrah Independent School District v. Martin, supra*, 440 U.S. at 198–99, 99 S.Ct. at 1064 (school board did not act arbitrarily in imposing and enforcing against plaintiff a new penalty for noncompliance with continuing–education requirement).

 In contrast, the summary demotion procedure was not rationally related to the interests of the institution. The Board met in several secret meetings to discuss plaintiff, over a period of time in which they easily could have honored his request for an opportunity to address them. By the summary demotion procedure, the Board acted rashly and in haste, and their action constituted an arbitrary and capricious denial to plaintiff of his right to substantive due process. The Court concludes that defendant San Jacinto Junior College, and all other defendants, in both their official and individual capacities, are liable to plaintiff for said violation of his constitutional right to substantive due process. Refer to Conclusion 9.

 The final inquiry on this claim is whether the professional conduct policy was applied unequally to plaintiff. The Court concludes that defendants did not enforce the policy unequally against plaintiff. Although rumors had circulated concerning other members of the faculty and no action had been taken against those persons by the Board, plaintiff failed to prove that those persons actually had violated the professional conduct policy, and subsequently escaped Board action. Plaintiff chose to confess his affair, relying on the fact that no action had been taken against others about whom he had heard similar rumors. Although defendants' actions with regard to plaintiff's confession were not admirable, those actions did not constitute unequal treatment which is prohibited by the Constitution. Refer to Findings 19–23, 25–31, 34–36, 41–42, 46.

### C. First Amendment

 8. Plaintiff asserts that his request for a hearing coupled with his refusal to resign without being heard was a valid exercise of his First Amendment right to petition for redress of grievances and was a substantial factor in the Board's summarily demoting him. The states may not abridge the rights guaranteed pursuant to the First

---

**6.** The Court concludes that one of the reasons given for plaintiff's demotion, his contact with students, was not rationally related to the institutional interests represented by the professional conduct policy. Although demotion for that reason might be rational in other situations, plaintiff had more direct contact with students as a teacher than as Registrar. Refer

to Finding 34. Nonetheless, inasmuch as some of defendants' reasons for the final action of demotion rendered the action constitutionally permissible, the reaffirmation of plaintiff's demotion did not constitute an arbitrary and capricious action. *See, e. g., Sedule v. Capital School District*, 425 F.Supp. 552, 558 (D.Del. 1976).

Amendment, *see, e. g., New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Further, the rights to assemble peaceably and to petition for redress of grievances "are among the most precious of the liberties safeguarded by the Bill of Rights," *United Mine Workers v. Illinois Bar Association,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967), and are inseparable from the rights of free speech and of free press, *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945). Plaintiff not only had the right to petition the Board of Regents of the College pursuant to the First Amendment, *see, e. g., United Transportation Union v. State Bar of Michigan,* 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971) *and NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), he also had the right to a hearing pursuant to the policies of the College. By their summary demotion procedure, defendants arbitrarily and capriciously acted in derogation of plaintiff's First Amendment rights. *See, e. g., Burnaman v. Bay City Independent School District,* 445 F.Supp. 927 (S.D.Tex.1978).

Plaintiff first must prove that his conduct was constitutionally protected. Plaintiff has proved that he refused to resign from a contractually awarded position without an opportunity to be heard, that the College policies guaranteed him the opportunity to be heard and that he requested and was denied that opportunity. Accordingly, the Court concludes that plaintiff thereby exercised his First Amendment right to petition to redress grievances.

Plaintiff then must prove that his protected conduct was a substantial and motivating factor in the action taken by defendants. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The Court concludes that the plaintiff's exercise of his First Amendment right to refuse to resign before he could be heard pursuant to school policy was a substantial factor in the defendants' action to summarily demote him. *See Burnaman v. Bay City Independent School District, supra.* Once the plaintiff has met his burden, the defendants must prove by a preponderance of the evidence that they would have taken the same action even in the absence of the protected conduct. *Mt. Healthy City Board of Education v. Doyle, supra,* 429 U.S. at 287, 97 S.Ct. at 576. The Court concludes that, in the absence of plaintiff's refusal to resign coupled with his request for a hearing, the necessity for the summary demotion decision would have been obviated. Accordingly, defendants did not show that they would have demoted him summarily even in the absence of protected conduct, and they have failed to meet their required burden. *See Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). The Court emphasizes that the instant First Amendment analysis applies only to the summary demotion action taken by defendants in 1977. Their subsequent decision to reaffirm the 1977 demotion was supported adequately by other reasons, and that proceeding is analyzed separately.

Accordingly, plaintiff has met his burden of demonstrating entitlement to reinstatement as Registrar. *See Givhan v. Western Line Consolidated School District, supra; Mt. Healthy City Board of Education v. Doyle, supra.* The Court, however, has determined that reinstatement is an inappropriate remedy on the instant facts, and damages will be awarded instead. Subsequent to the summary demotion which affected only one academic year, plaintiff was afforded a hearing that complied with the requisites of due process, and the decision to demote him was reaffirmed. Thus, plaintiff has proved violations of his First Amendment rights only as to the summary demotion procedure. As a consequence, plaintiff will not be reinstated, and his back pay remedy is limited to the time between his demotion and the post–deprivation hearing. *See Glenn v. Newman,* 614 F.2d 467, 473 (5th Cir. 1980). Damages which will be awarded to compensate plaintiff for the

violation of his First Amendment right are recoverable from defendant San Jacinto Junior College, and from all other defendants in both their official and individual capacities. Refer to Conclusion 9. Refer to Findings 10, 25, 26, 28, 30, 33, 34, 37, 38.

### D. Immunity

 9. The junior college is local and independent in nature and therefore cannot enjoy immunity afforded to the State pursuant to the Eleventh Amendment. *See Hander v. San Jacinto Junior College,* 519 F.2d 273, 278–80 (5th Cir.), *rehearing denied,* 522 F.2d 204 (5th Cir. 1975). The *Hander* Court recognized that under Texas law, junior college districts are in the nature of municipal corporations. *Hander v. San Jacinto Junior College, supra,* at 279–80 & n.3. Accordingly, San Jacinto College falls within a recent ruling of the Supreme Court and "may not assert the good faith of its officers or agents as a defense to liability under § 1983." *Owen v. City of Independence,* 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673, 685–86 (1980) (footnote omitted).

 The individual defendants are clothed with qualified immunity from Section 1983 damage actions and cannot be held personally liable for actions taken within their spheres of official responsibility unless plaintiff proves that they should be deprived of immunity. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1975); *Hander v. San Jacinto Junior College, supra* ; *Sapp v. Renfroe,* 511 F.2d 172 (5th Cir. 1975). In order to pierce the veil of immunity, plaintiff must prove as to each defendant, either (1) that he acted "with such disregard of [plaintiff's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith," *Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978) or (2) that he acted "with the malicious intention to cause a deprivation of constitutional rights or other injury to the [plaintiff]." *Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. at 1001.

 "Under the first part of the *Wood v. Strickland* rule, the immunity defense would be unavailing to [defendants] if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm." *Procunier v. Navarette, supra,* 434 U.S. at 562, 98 S.Ct. at 860. In the alternative, the second prong of the rule requires plaintiff to prove that a defendant "either actually intended to do harm to the plaintiff, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result. . . . [T]he test requires that a plaintiff show that the official's action, although labeled as 'reckless' or 'grossly negligent', falls on the actual intent side of those terms, rather than on the side of simple negligence." *Bogard v. Cook,* 586 F.2d 399, 412 (5th Cir. 1978) (footnote omitted). *See Procunier v. Navarette, supra,* 434 U.S. at 566, 98 S.Ct. at 862. In addition to proving one of the above sets of facts, plaintiff must prove that each defendant was personally involved in the alleged deprivation. Recovery pursuant to Section 1983 may not be based on vicarious liability of an official for the actions of others; "[l]iability may be found only if there is personal involvement of the officer being sued . . . ." *Watson v. Interstate Fire & Cas. Co.,* 611 F.2d 120, 123 (5th Cir. 1980) citing *Baskin v. Parker,* 602 F.2d 1205 (5th Cir. 1979) (on rehearing).

 With regard to each deprivation of a constitutional right imposed upon plaintiff by defendants, the Court concludes that each defendant should have known of plaintiff's rights at the time they collectively decided to demote him without a hearing. Moreover, defendant Spencer should have known of plaintiff's rights to a closed hearing at the time he released information to the press. Although defendants are not " 'charged with predicting the future course of constitutional law'," *Wood v. Strickland,*

*supra,* 420 U.S. at 322, 95 S.Ct. at 1001, quoting *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), an act which violated constitutional rights may not be "justified by ignorance or disregard of settled, indisputable law on the part of one . . . who has voluntarily undertaken the task of supervising the operation of the school . . . ." *Wood v. Strickland, supra,* 420 U.S. at 321–22, 95 S.Ct. at 1000. The Court concludes that each of plaintiff's constitutional rights of which he was deprived clearly was established at the times defendants acted against him. Accordingly, defendants' claims that they relied on the advice of their attorney will not enable them to avoid individual liability for knowingly depriving plaintiff of his constitutional rights. Further, the Court concludes that each defendant personally was involved in the actions taken against plaintiff, with the exception that only Spencer was involved in violating plaintiff's right to a closed hearing. Refer to Findings 11, 12, 25, 26, 28, 30, 37, 42–46, 50–52.

10. Plaintiff, John R. Johnson, is entitled to recover against defendant San Jacinto College and against defendants Thomas Spencer, F. G. Anders, Dr. D. R. Davison, Charles Ray Ogden and W. L. Smallwood, both in their official and in their individual capacities. The parties are instructed to submit to the Court memoranda regarding proof of damages within ten (10) days hereafter. Refer to Findings 51–53.

11. Plaintiff is entitled to recover the costs of this action and reasonable attorney's fees. 42 U.S.C. § 1988 (1976); *see Newman v. Piggie Park Enterprises,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). The amount of attorney's fees is to be ascertained pursuant to the guidelines provided in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974). The plaintiff will incorporate within its memorandum appropriate evidence for the Court to consider on this issue. If a hearing is required, counsel may so move.

12. In the event that any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such. In the event that any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

### IV. Conclusion

In summary, the Court does not conclude herein that plaintiff's adulterous relationship was protected by the constitutional right of privacy. On the contrary, it was not so protected. The Court, however, does conclude that plaintiff possessed certain constitutional rights in the context of this case: (1) the right to procedural due process in conjunction with demotion proceedings; (2) the substantive due process right to a closed hearing; (3) the right to substantive due process in conjunction with having the professional conduct policy enforced against him; and (4) the First Amendment right to petition for redress of grievances. Those four rights of plaintiff were violated by defendants, and plaintiff is entitled to recover damages for said infringements. Under the circumstances of this case, however, plaintiff is not entitled to reinstatement as Registrar.

It is so ordered.